**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No. 8:14-cr-409-T-36TBM**

UNITED STATES OF AMERICA

**5 May 2015**
**9:25 a.m.**
-vs-
**Courtroom 13A**

GERALD ROBERT CHAUCA,
WAGNER CRUZ,
BRYANT TERRELL FREEMAN,
CHRISTOPHER WHITTEN,
AKEEM LIKA,

            Defendants.
-----------------------------/

**TRANSCRIPT OF PROCEEDINGS**
*(EVIDENTIARY HEARING/SENTENCING HEARING – PHASE 1)*
**BEFORE THE HONORABLE CHARLENE EDWARDS HONEYWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>APPEARANCES</u>

**For the Government:**   **KATHY J. M. PELUSO, ESQUIRE**
                          *Assistant United States Attorney*
                          *United States Attorney's Office*
                          400 North Tampa Street
                          Suite 3200
                          Tampa, Florida 33602
                          Phone: (813)274-6122
                          Fax: (813)274-6125
                          kathy.peluso@usdoj.gov


**For the Defendant**     **ROGER FUTERMAN, ESQUIRE**
**Gerald Robert**         *Roger D. Futerman & Associates*
**Chauca:**               13620 Forty-Ninth Street North
                          Suite 201
                          Clearwater, Florida 33762
                          Phone: (727)344-5511
                          futermanlaw@yahoo.com

*(appearances continued on next page)*

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

| | |
|---|---|
| **For the Defendant Wagner Cruz:** | **HOWARD C. ANDERSON, ESQUIRE** *Assistant Federal Public Defender* *Federal Public Defender's Office* 400 North Tampa Street Suite 2700 Tampa, Florida 33602 Phone: (813)228-2715 Fax: (813)228-2562 howard_anderson@fd.org |
| **For the Defendant Bryant Terrell Freeman:** | **CIMOS A. ANGELIS, ESQUIRE** *Law Office of Cimos A. Angelis* 642 East Tarpon Avenue Tarpon Springs, Florida 34689 Phone: (727)798-4189 Fax: (727)944-4563 cangelis@tampabay.rr.com |
| **For the Defendant Christopher Whitten:** | **BRYANT ASHLEY SCRIVEN, ESQUIRE** *Scriven Law, P.A.* 402 East Seventh Avenue Tampa, Florida 33602 Phone: (813)226-8522 Fax: (813)425-2372 scrivenlaw@gmail.com |
| **For the Defendant Akeem Lika:** | **RAY CHRISTOPHER LOPEZ, ESQUIRE** *Law Office of Ray Christopher Lopez* 115 South Albany Avenue Tampa, Florida 33606 Phone: (813)221-4455 Fax: (813)251-1517 rclopezlaw@verizon.net |
| <u>ALSO PRESENT</u> | **GERALD ROBERT CHAUCA (Defendant)** **WAGNER CRUZ (Defendant)** **BRYANT TERRELL FREEMAN (Defendant)** **CHRISTOPHER WHITTEN (Defendant)** **AKEEM LIKA (Defendant)** JANET RAYBUCK (Agent, Drug Enforcement Administration) DEXTER McGEE (Agent, Drug Enforcement Administration) CHRISTINE HATTEN (Probation Officer) WILLYE DENT (Courtroom Deputy Clerk) GAIL WILLIAMS (Court Security Officer) |

*(appearances continued on next page)*

REPORTED BY          SHERRILL L. JACKSON, RPR, FPR
                     *Federal Official Court Reporter*
                     801 North Florida Avenue
                     Suite 13A
                     Tampa, Florida 33602
                     Phone:  (813) 301-5041
                     stenorella@aol.com

*I N D E X   T O   P R O C E E D I N G S*

                                                          Page
OPENING STATEMENTS ....................................   6

DR. DANIEL WILLENBRING

  Direct Examination by Ms. Peluso ...................   12

  Cross-Examination by Mr. Futerman ..................   29

  Cross-Examination by Mr. Anderson ..................   30

  Cross-Examination by Mr. Scriven ...................   34

  Cross-Examination by Mr. Lopez .....................   37

DR. CASSANDRA PRIOLEAU

  Direct Examination by Ms. Peluso ...................   40

  Cross-Examinatio by Mr. Anderson ...................   54

  Redirect Examination by Ms. Peluso .................   62

DR. GREGORY DUDLEY

  Direct Examination by Mr. Anderson .................   65

  Voir Dire Examination by Ms. Peluso ................   76

  Continuation of Direct Examination by Mr. Anderson ...  82

  Cross-Examination by Mr. Scriven ...................  100

  Cross-Examination by Ms. Peluso ....................  115

  Redirect Examination by Mr. Anderson ...............  127

CLOSING ARGUMENTS .....................................  133

CERTIFICATE OF REPORTER ...............................  146

*SHERRILL L. JACKSON, RPR, FPR*
*Federal Official Court Reporter, U.S. District Court*
*Middle District of Florida, Tampa Division*

*I N D E X   T O   E X H I B I T S*

Page

Government's Exhibit 1 ................................. 16

Defendant's Exhibits A1 ............................... 98

Defendant's Exhibit 2 ................................. 98

Defendant's Exhibit 3 ................................. 98

Defendant's Exhibit 4 ................................. 98

Defendant's Exhibit 6 ................................. 98

Defendant's Exhibit 7 ................................. 98

Defendant's Exhibit 8 ................................. 98

```
 1              P R O C E E D I N G S        (9:25 a.m.)

 2          THE COURT:  All right, good morning.

 3          ALL ATTORNEYS:  Good morning, Your Honor.

 4          THE COURT:  We are here this morning in the matter

 5   of the United States of America vs. Gerald Robert Chauca,

 6   Wagner Cruz, Bryant Freeman, Christopher Whitten, and Akeem

 7   Lika.

 8          Counsel, please identify yourselves for the

 9   record.

10          MS. PELUSO:  Good afternoon, Your Honor.  Kathy

11   Peluso for the United States -- or good morning, I mean.

12          MR. FUTERMAN:  Good morning, Your Honor.  Roger

13   Futerman on behalf of Gerald Chauca.

14          MR. ANDERSON:  Judge Honeywell, Good morning.

15   Howard Anderson on behalf of Mr. Wagner Cruz.  Your Honor,

16   Mr. Cruz is en route from south Florida.  Apparently there

17   were some issues on I-75.  He should be here momentarily.

18   We do apologize for that inconvenience to the court, other

19   counsel, and the government, Your Honor, but he is en route.

20          MR. ANGELIS:  Good morning, Your Honor.  Cimos

21   Angelis on behalf of Bryant Freeman.  Mr. Freeman is also

22   present here today.

23          THE COURT:  Okay.

24          MR. SCRIVEN:  Good morning, Your Honor.  Bryant

25   Scriven on behalf of Christopher Whitten, present.
```

```
 1              MR. LOPEZ:  Good morning, Your Honor.  Ray Lopez

 2  on behalf after Akeem Lika, who is present and seated to my

 3  left.

 4              THE COURT:  All right, thank you.

 5              And we are here with regard to a sentencing issue

 6  that applies to all defendants in this case, and that is the

 7  appropriate ratio for the court in determining the

 8  sentencing guidelines as it relates to ethylone that has

 9  been utilized in this case.

10              We started this last week.  However, at that time

11  the defendants' expert was not present.  I continued it for

12  an evidentiary today.

13              Is the government ready to proceed?

14              MS. PELUSO:  Yes, Your Honor.

15              THE COURT:  All right.  Do you wish to make an

16  opening statement, or are you ready to call witnesses?

17              MS. PELUSO:  I'll just make a real brief one.

18              THE COURT:  Okay.

19                         OPENING STATEMENTS

20              MS. PELUSO:  Your Honor, our position, as I

21  believe I stated at the last hearing, is that, you know --

22  the issue in this case is whether or not -- or how the

23  substance involved in this case, ethylone, is to be treated

24  in the guidelines, in other words, which marijuana

25  equivalency ratio should apply to this drug.
```

```
1              The guidelines clearly state that the court should
2   use the base offense level using the marijuana equivalency
3   of the most closely related controlled substance referenced
4   in the guideline; and in determining so, it should, to the
5   extent practicable, consider the three different
6   possibilities.  And that's in Note 6 to Section 2D1.1 of the
7   United States Sentencing Guidelines; and the first section
8   says, "Whether the controlled substance not referenced in
9   this guideline," which in this case is ethylone, "has a
10  chemical structure that is substantially similar to a
11  controlled substance actually referenced in the guideline."
12             And then the second factor that the court can
13  consider to the extent practicable -- and we think that the
14  wording "to the extent practicable" is important in this
15  case, Your Honor.  On Section (B), "Whether the controlled
16  substance not referenced," which in this case is ethanol --
17  ethylone, "has a stimulant, depressant, or depressant or
18  hallucinogenic effect on the central nervous system."
19             Again, that is substantially similar to the same
20  effects on the central nervous system of an actual
21  controlled substance listed in the guideline.
22             And then (C), of course, which is -- seems to be a
23  matter of contention in this case, "whether a lesser or
24  greater quantity of the" ethylone "is needed to produce a
25  substantially similar effect to the central nervous system
```

1  as the controlled substance for which it's being compared

2  to."

3          Our position is, Your Honor, that the court should

4  calculate these defendants' base offense level using the

5  base level governing MDEA, which is listed in the sentencing

6  guidelines.

7          You're going to hear testimony that the listed

8  substance, MDEA, is the most closely related chemically to

9  ethylone; and, Your Honor, you're also going to hear

10  testimony that although, as to Subsection (B), that ethylone

11  has a similar effect on the central nervous system as does

12  MDEA, there's no scientifically acceptable data available in

13  order to conclude whether or not a greater or lesser

14  quantity of ethylone is needed to have the same -- the same

15  effect on the central nervous system as MDEA.

16          So, our argument is that you do not consider

17  Subsection (C) because it's not practicable to do so.  There

18  is no scientifically accepted tests or conclusions that can

19  allow you to do that.

20          So, therefore, we're going to ask the court just

21  to determine that the most closely related substance is MDEA

22  with a 500-to-1 ratio in the guidelines and that there

23  should not be any modification to that offense level based

24  on any potency.  And that's because, number one, again,

25  there's insufficient evidence available as to the potency of

1  ethylone and to make such determination would be baseless

2  and that the potency of drugs, I think, very importantly

3  here, Your Honor, is not material to sentencing.  So, the

4  court shouldn't be varying in any degree just based on

5  extrapolated arguments of potency.

6       THE COURT:  Don't the guidelines list that in (C)?

7  I mean, isn't that part of Subsection (C), the potency

8  issue?

9       MS. PELUSO:  We're saying you shouldn't consider

10 that.  The defense is going to ask you to consider a lot of

11 data regarding potency.

12       THE COURT:  Right.

13       MS. PELUSO:  But we're going to say that there's

14 no scientifically acceptable data for the court to do so.

15       THE COURT:  And I understand that argument, but

16 you just said that you didn't think that the guidelines

17 considered potency, in essence; and I thought, well, in

18 looking at Subsection (C), that's exactly what they're

19 telling me to consider to the extent there's available data.

20       MS. PELUSO:  No.  We're asking you not to; and

21 then also, even apart from the determination as to which

22 ratio applies, that the guidelines in general don't -- don't

23 give a variance for the court to find based on potency of

24 any drug.

25       For instance, if they were to have been found

1   guilty of importing or transporting or possessing with

2   intent to distribute 5 kilograms of cocaine, the court would

3   not determine the potency of the cocaine in determining the

4   relevant guideline.  It would be the total substance.  It

5   would be the total weight of the cocaine.

6          In other words, 1 kilogram of cocaine, whether

7   it's 98 percent pure or 20 percent pure, the defendant is

8   still held responsible for a kilogram of cocaine, and I

9   think that's what my argument was.

10          THE COURT:  Okay.

11          MS. PELUSO:  So, in any event, that's what we're

12   going to basically ask the court to do, is just to apply the

13   500-to-1 ratio that applies to MDEA without any regard to

14   the potency, because there is no information available to

15   the court to rely on potency of ethylone versus MDEA, and

16   we're going to, for the court, call two experts today.

17   They're both employed by DEA.  They both have Ph.D.s.

18          Our first expert, Daniel Willenberg [sic] is with

19   the DEA, and he is a specialist with the Office of Diversion

20   Control, and he specializes in chemistry.

21          The second expert we're going to call is Cassandra

22   Prioleau.  She's also employed with DEA, and she is an

23   expert in the area of pharmacology.

24          Dr. Willenberg -- Willenbring, I'm sorry, will be

25   testifying about the chemical structures and the similarity

 1  between ethylone and MDEA, and Miss Prioleau will be

 2  testifying -- or Dr. Prioleau will be testifying about the

 3  pharmacological effects on the human body and the central

 4  nervous system.

 5          THE COURT:  Okay, which one are you calling first?

 6          MS. PELUSO:  Okay.  We will call Dr. Daniel

 7  Willenbring.

 8          THE COURT:  All right, Dr. Willenbring, if you

 9  will come forward, please.

10          (The witness was duly sworn or affirmed and

11  responded as follows:)

12          THE DEFENDANT:  Yes.

13          THE CLERK:  Please state your name and spell your

14  last name for the record.

15          THE WITNESS:  Daniel Willenbring, W-I-L-L-E-N-

16  B-R-I-N-G.

17          THE COURT:  All right, Mr. Willenbring, adjust the

18  microphone closer.

19          Madam Clerk, you may adjust the volume as well.

20          (Pause.)

21          THE COURT:  All right, you may inquire,

22  Miss Peluso.

23          MS. PELUSO:  Okay.

24                  **DR. DANIEL WILLENBRING,**

25  the witness, being sworn or affirmed, testified as follows:

1                      *DIRECT EXAMINATION*

2    BY MS. PELUSO:

3    Q     For the record, your name is -- you're Dr. Daniel

4    Willenbring?

5    A     That's correct.

6    Q     Where are you currently employed?

7    A     At the Drug Enforcement Administration in Arlington,

8    Virginia.

9    Q     Pardon me?  I can't hear you.

10   A     The Drug Enforcement Administration.  It's in

11   Arlington, Virginia.  It's my place of employment.

12   Q     And with the DEA, you're with the Office of Diversion

13   Control?

14   A     Correct.

15   Q     And what type of specialist are you?

16   A     My title is a drug science specialist.  My training is

17   in chemistry.

18   Q     Okay, and generally what does a drug science specialist

19   do for DEA?  There's two types; right?

20   A     Correct.  There's two units.  I'm in like the chemistry

21   side of the drug and chemical evaluation section, so I would

22   respond to control status inquiries.  So, a company or

23   researcher might write in and then ask whether or not

24   they're handling a substance that might be controlled, and

25   we provide them a determination based on the definitions and

1   the listings in the Controlled Substances Act.

2       I also collect and evaluate information regarding

3   substances of abuse and chemical precursors to those

4   substances.

5   Q    And can you tell the court what type of education you

6   received that qualifies you to perform that job with the

7   DEA.

8   A    I have a bachelor's degree in chemistry and computer

9   science.  It's a double major from the University of

10  St. Thomas in St. Paul, Minnesota, and I have a Ph.D. in

11  organic chemistry from the University of California at

12  Davis.

13  Q    And since you received your Ph.D., have you had any

14  other work experience other than with the DEA?

15  A    After I finished my graduate work, I went to Pittsburgh

16  and worked as a post-doctoral fellow at the University of

17  Pittsburgh in the Department of Anesthesiology; and

18  following that, I moved to Boston and taught undergraduate

19  classes for a short period and worked at a company that did

20  contract work for pharmaceutical companies.

21  Q    Okay.  Have you -- pursuant to your duties with the

22  DEA, do you have an opportunity to compare similar chemical

23  substances of different substances?

24  A    Yes.

25  Q    And is that a good percentage of your work?

```
 1   A    I do that on a daily basis; that's correct (nodding
 2   head).
 3   Q    Okay, and have you testified before in -- in federal
 4   district court as an expert in the area of chemistry and
 5   specifically in comparing the chemical structures of
 6   different substances?
 7   A    Yes.
 8   Q    And can you tell us approximately how many times?
 9   A    It's about seven, maybe eight times.
10   Q    Okay.  And how many of those times did you specifically
11   testify regarding the substance involved in this case, that
12   is, ethylone, versus other controlled substances?
13   A    I've -- this will be the fourth time for ethylone.
14   Q    So -- and the first time being with a Judge King in
15   south Florida?
16   A    That's correct.
17   Q    And the second time being with Judge Merryday here in
18   this courthouse?
19   A    Correct.
20   Q    Okay, and the last time was just recently last week in
21   Fort Myers in federal district court?
22   A    Yes.
23   Q    Okay, and have you then, pursuant to your request to
24   testify in those cases and in this case, made a specific
25   determination with regard to ethylone -- and let me back up.
```

```
 1   Ethylone is not an actual named substance in the
 2   United States Sentencing Guidelines, is it?
 3   A     That's correct.
 4   Q     And have -- and you're familiar with the requirement
 5   that in order to determine an appropriate guideline level,
 6   that it needs to be compared to a substance that's actually
 7   named in the guidelines?
 8   A     Yes.
 9   Q     And did you have the opportunity to do that with regard
10   to ethylone?
11   A     I have.
12             MS. PELUSO:  All right.
13             Your Honor, if there's no objection, I would like
14   to go directly into the substance of his testimony as an
15   expert.
16             THE COURT:  Are there any objections?
17             MR. ANDERSON:  No objections, Your Honor.
18             THE COURT:  All right, you may proceed.
19   BY MS. PELUSO:
20   Q     In anticipation of your testimony in these prior cases
21   with regard to ethylone and in anticipation of your
22   testimony and your comparisons, did you prepare a document
23   or a series of slides in order to assist you in explaining
24   to the court what your conclusions are?
25   A     Yes.
```

 1              MS. PELUSO:  May I approach the witness?

 2              THE COURT:  You may.

 3  BY MS. PELUSO:

 4  Q    (Hands item to the witness.)  I've handed you what's

 5  been marked as Government's Exhibit 1 for Identification.

 6  Is that the series of slides that you prepared?

 7  A    Yes.

 8              MS. PELUSO:  May we move to admit Government's

 9  Exhibit 1?

10              THE COURT:  Is there any objection?

11              MR. ANDERSON:  No objection, Your Honor.

12              THE COURT:  Government's Exhibit 1 is admitted.

13              (Government's Exhibit 1 was received in evidence.)

14              MS. PELUSO:  Your Honor, if we could, may we

15  publish it on the screen?

16              THE COURT:  Yes.

17              MS. PELUSO:  I wonder it we could turn the lights

18  down a little bit so that the screen will be clearer.

19  (Changes overhead exhibit.)

20              (Defendant Cruz enters the courtroom.)

21              MS. PELUSO:  Your Honor, I wonder if we could note

22  for the record, just for protection of the record, that

23  Defendant Cruz has arrived in the courtroom.

24              THE COURT:  All right, the record will so reflect

25  that Defendant Cruz is present now.

1           MS. PELUSO:   Thank you, Your Honor.

2    BY MS. PELUSO:

3    Q     Okay, Dr. Willenbring, can you look at this.  This is

4    the first page of the presentation that you prepared, and

5    it's entitled "Introduction to Chemical Structures."  Can

6    you describe to the court what's depicted on the screen and

7    what it means?

8    A     There are two structures on the screen.  They represent

9    the same chemical.  The chemical's known as

10   "phenethylamine."  The structure on the left has all of the

11   atoms showing.  So, all the letter Cs, the Hs, those

12   represent carbon and hydrogen atoms.  There's one N, which

13   represents the nitrogen atom.

14         On the structure on the right, all of those Cs and Hs

15   have been abbreviated, so they're not explicitly shown.

16   They're just implied that they're there, and this is called

17   "a bond line notation," and this is what's commonly used in

18   organic chemistry and textbooks and papers, patent

19   literature.

20         On that structure, the bond line notation, there's some

21   numbers and some Greek letters.  Those represent positions

22   on the phenethylamine core that can be substituted with

23   other things.

24         So, for ethylone and MDEA, there are going to be seen

25   substitutions at the 3, the 4, the alpha, and the beta

1  position, as well as the nitrogen atom.

2  Q    And why did you select phenethylamine in this

3  particular case?

4  A    Phenethylamine is the core structure.  It's the -- the

5  basis for both MDEA and for ethylone.

6  Q    Okay.  And if we could -- this is the second page of

7  the presentation that you provided.  Can you describe to the

8  court (changing overhead exhibit) -- and I think it's

9  entitled "Chemical Structures of Ethylone and MDEA, Schedule

10  I Controlled Substances."  Can you describe for the court

11  what that slide depicts?

12  A    There are two structures on the slide.  Ethylone is the

13  substance at issue here.  That's on the top.  And MDEA is

14  the substance that's specifically listed in the U.S.

15  Sentencing Guidelines.  That's on the bottom.

16  Q    Okay.  Now, before we go into the similarities here,

17  ethylone is not actually listed as a Schedule I substance --

18  controlled substance?

19  A    It's defined as a controlled substance (nodding head).

20  Q    Okay, and that would be Schedule I?

21  A    Correct.

22  Q    Okay.  And I think there's been some information that's

23  been provided that it's a positional isomer of butylone?

24  A    That's correct.  It's a positional isomer of butylone.

25  Q    Can you describe what that is, what a positional isomer

1  is?

2  A    There's a definition in the CFR to what a positional

3  isomer means in terms of the law, and this fits that

4  definition.  It has the same core structure, the

5  phenethylamine core.  It has the same atoms.  So, all the

6  atoms that are in butylone are also in ethylone.  They're

7  just in a different isomer.

8  Q    Okay, and as -- and are you familiar with when the DEA

9  actually officially listed ethylone as a Schedule I

10 controlled substance because it's the positional isomer of

11 butylone?

12 A    Butylone was scheduled in March of 2014.

13 Q    Okay.  So, that's -- butylone was specifically listed

14 as a controlled substance then?

15 A    That's correct, along with its positional isomers,

16 which includes ethylone.

17 Q    And Ethylone thereby is a controlled substance,

18 Schedule I, because it's a positional isomer?

19 A    On the same date, yes.  That's correct.

20 Q    Of butylone?

21 A    (Nods head.)

22 Q    Now, going back to this slide, can you describe

23 specifically why it is -- let me just ask you this:  Have

24 you made a conclusion regarding which controlled substance

25 is substantially similar in criminal structure as ethylone?

```
 1   A     MDEA is substantially similar in chemical structure to

 2   ethylone.

 3   Q     And can you tell the court why that is?

 4   A     I looked at the core structure for these substances,

 5   the phenethylamine.  I looked at where that core was

 6   substituted, and I looked at what was substituted at those

 7   positions.

 8   Q     And can you describe what you determined?

 9   A     The --

10   Q     In other words, what's similar and what's different, if

11   anything?

12   A     Sure.  It has the same core structure.  It has the same

13   3,4-methylenedioxy group on the phenyl ring of the core

14   structure.  They both are substituted with a methyl at the

15   alpha position.  They're both substituted on the nitrogen

16   atom with an ethyl group, and the only difference is the

17   oxygen atom (pointing) right there.  That's called a "beta-

18   keto" or "beta ketone."  That's on ethylone, but it is not

19   on MDEA.

20   Q     Is there any more comment you would like to make on

21   this slide before we go on to the third slide?

22   A     No.

23   Q     (Changes overhead exhibit.)

24         THE COURT:  Give me just a moment here.

25         We'll be in recess.  Let's take about five minutes
```

1  before we get to the next question to see if we can get the

2  microphone working so that the witness won't have to hold

3  that one while testifying.

4          We'll be in recess for five minutes.

5          (Recess from until 10:06 a.m. until 10:10 a.m.)

6          THE COURT:  We are ready to resume, I'm told.  We

7  have a working microphone.

8          You may resume your examination.

9          MS. PELUSO:  Thank you, Your Honor.

10 BY MS. PELUSO:

11 Q    Dr. Willenbring, before we broke, we were focusing on

12 page 3 of your slide presentation, and that's entitled

13 "Substantial Similarity of Chemical Structures of Ethylone

14 and MDEA."

15      You previously had said that you had determined and you

16 opined that ethylone is most similar to MDEA in chemical

17 structure; correct?

18 A    Ethylone is substantially similar to MDEA in chemical

19 structure (nodding head).

20 Q    So, using the table that you have depicted on page 3 of

21 Exhibit 1, can you explain to the court how that supports

22 your conclusion?

23 A    The structural features that I mentioned earlier are

24 listed on the left-most column of the table.  MDEA is in the

25 center column, and the structures of ethylone are in the

1  right-hand column.

2  Q    Structures of what, I'm sorry?

3  A    Ethylone.

4  Q    Okay.

5  A    The first feature was the phenethylamine core, and

6  that's on the first row of this table.  That's the portion

7  that's highlighted in blue in both structures, and that's

8  the same in MDEA and in ethylone.

9  Q    And that's the first row?

10 A    Correct.  The second row is the 3,4-methylenedioxy

11 group, and that's on the left-hand portion as it's drawn.

12 Q    And that's highlighted in blue on the second row?

13 A    Correct, and that's the same substitution in the same

14 positions on both MDEA and ethylone.

15      The third row is the alpha position substitution, and

16 that's a methyl group, and that's the same in both MDEA and

17 in ethylone.  It's the same substitution at the same

18 position.

19 Q    Okay.

20 A    The fourth row is the nitrogen substitution, so that's

21 the portion on the right-most part (pointing) of each

22 substance, and that's the same substitution in the same

23 position again.

24      The last row is that beta-keto group, and that's

25 highlighted in red, and that exists on ethylone.  On MDEA,

```
 1   that position is not substituted.  There are two hydrogen
 2   atoms in that position instead.
 3   Q    Okay.  So, do -- except for the difference on the beta-
 4   keto, do the substances differ in any manner?
 5   A    Except for the one substitution that's highlighted in
 6   that last row, the substitution -- the substances are
 7   chemically identical except for that one substitution.
 8           MS. PELUSO:  Okay.  Would you scroll up to page 3
 9   of the slide, please.
10   BY MS. PELUSO:
11   Q    (Changes overhead exhibit.) Now, what does the last
12   page -- and that's page 4 of Government's Exhibit 1 --
13   depict for the court?
14   A    This is a summary of what was in the previous table.
15   So, moving from left to right, the 3,4-methylenedioxy is
16   highlighted in that pink or fuchsia color.  The
17   phenethylamine core is in black in both substances.  The
18   difference on the top structure on ethylone is the beta-keto
19   group or beta ketone.  The blue portion is the alpha-alkyl.
20   That's the methyl group that I discussed.  And on the
21   right-most portion is the nitrogen substitution, and that's
22   the ethyl group, and that's in green.
23   Q    Okay.  So, part of your work with the DEA is actually
24   evaluating cases and similarities in conjunction with the
25   United States Sentencing Guidelines?
```

1    A    Correct (nodding head).

2    Q    And in this case, as well as in your prior testimony,

3    you had the opportunity to review the sentencing guidelines

4    in order to make a determination of what listed substance is

5    most closely related to the unlisted substance in this case,

6    which is ethylone?

7    A    Correct (nodding head).

8    Q    Correct?  Okay.

9         Now, and as you've testified already, your conclusion

10   was ethylone was most closely related in chemical structure

11   to MDEA.  Is that still your opinion this morning?

12   A    Yeah.  Ethylone is substantially similar in chemical

13   structure to MDEA (nodding head).

14   Q    And is that with regard to the first factor in the

15   sentencing guidelines of Note 6, 2D1.1?

16   A    That's correct.

17   Q    Now, are you familiar with a little bit in the

18   beginning of Paragraph 2D1.1, Note 6, that talks about

19   considering the same quantity of an analogue and whether it

20   produces a greater effect on the central nervous system than

21   the controlled substance for which it is an analogue?  Are

22   you familiar with that language?

23   A    Yes.

24   Q    Okay.  Can you tell us whether that applies to this

25   comparison at all and whether the court should even consider

```
 1   that part of the guideline?

 2   A    The guideline defines the term "analogue" as the

 3   definition used in Title 21 of U.S. Code 80232, which is the

 4   Analogue Act language, and it would not apply in this case

 5   because 80232(c)(1) prohibits you from using that language

 6   to apply to a substance that's already listed or controlled

 7   under one of the schedules; and since ethylone is

 8   controlled, it can't be defined as an analogue.

 9   Q    Okay.  So, therefore, the -- the second part of Note 6

10   where we have the (a), (b), and (c) factors that the court

11   can consider, that's most applicable in this case?

12   A    That's correct.

13             MS. PELUSO:  With the court's indulgence for a

14   minute, let me make sure I've covered --

15   BY MS. PELUSO:

16   Q    Now, have you had the opportunity to consider -- you're

17   familiar with methylone; correct?

18   A    Yes.

19   Q    And what is methylone?

20   A    Methylone is another controlled substance (nodding

21   head).

22   Q    Okay, and you're familiar with the fact that methylone

23   has been compared to MDMA as having the same or similar

24   chemical structure for the purposes of the guidelines?

25   A    That's correct.
```

1    Q     And it has been compared to MDMA very similarly to what

2    you were concluding regarding ethylone and MDEA?

3    A     That's also correct.

4    Q     Now, there has been, have there not, in the past some

5    kind of suggestion that ethylone should be compared to

6    methylone?

7    A     There has been that suggestion, yes (nodding head).

8    Q     Okay, and is that a correct -- is that a correct

9    comparison, in your experience, in your professional

10   opinion?

11   A     You can compare anything to anything else, but for

12   purposes of -- of sentencing, methylone is not listed or

13   referred to in the guidelines.

14   Q     So, therefore, this particular Note 6 can't apply to

15   ethylone and --

16         MR. LOPEZ:  Objection, leading, speculation.

17         MR. ANDERSON:  Objection, calls for a legal

18   conclusion here.

19         THE COURT:  Well, let me hear the question first.

20         So, would you state the question, and then I'll

21   hear the objections.

22   BY MS. PELUSO:

23   Q     Now, you have stated that part of your job is to

24   determine chemical structure similarities between substances

25   for the purposes of the sentencing guidelines.

```
 1   A     That's correct.
 2   Q     And so, in your experience, and pursuant to what you do
 3   in your job, would it be appropriate under this Note 6 of
 4   the Sentencing Guidelines to compare ethylone to methylone?
 5   A     Ethylone can be substantially similar to a number of
 6   substances, but I wouldn't compare it to some substance
 7   that's not referenced in the guidelines if I'm here to
 8   testify for sentencing purposes.
 9   Q     Okay.  So, in other words, methylone, like ethylone, is
10   simply not listed in the guidelines?
11   A     That's correct (nodding head).
12   Q     So -- and the guidelines require a comparison of the
13   unnamed or unlisted chemical --
14           MR. LOPEZ:  Objection, leading.
15           THE COURT:  Sustained.
16   BY MS. PELUSO:
17   Q     Now, your -- let me --
18           THE COURT:  Let me just go back and ask a
19   follow-up while we're at this juncture to make sure I
20   understood your response.
21           Dr. Willenbring, as it relates to the ethylone and
22   methylone -- and you said it would not be appropriate to
23   compare ethylone to methylone because methylone is also not
24   listed as a controlled substance in the sentencing
25   guidelines.
```

1          THE WITNESS:  That's correct.

2          THE COURT:  Okay.  So, what you did is you

3    compared ethylone to a controlled substance that was listed

4    in the sentencing guidelines; is that correct?

5          THE WITNESS:  That's correct.

6          THE COURT:  And that was the MDEA?

7          THE WITNESS:  Correct.

8          THE COURT:  All right, you may continue.

9    BY MS. PELUSO:

10   Q    And have you ever had the opportunity to consider

11   whether or not ethylone compares to yet another listed

12   controlled substance, and that being MDMA?

13   A    I haven't evaluated those, no.

14   Q    Now, your opinion is solely related to the factor in

15   6 -- Note 6A regarding whether or not ethylone is

16   substantially similar in chemical structure to MDEA;

17   correct?

18   A    Correct.

19   Q    And are you -- can you speak to whether or not the two

20   substances have a similar effect on the central nervous

21   system?

22   A    It's a pharmacology question, and I'm not an expert in

23   pharmacology, so no, I would not.

24   Q    And that would be your co-worker, Dr. Prioleau?

25   A    Correct.

```
 1              MS. PELUSO:  Okay.  I'd ask the court's
 2   indulgence.
 3              THE COURT:  Yes.
 4              (Pause while Miss Peluso looks at her notes.)
 5              MS. PELUSO:  That concludes my direct examination
 6   of this witness at this time.
 7              THE COURT:  All right, thank you.
 8              Cross-examination.
 9                       CROSS-EXAMINATION
10   BY MR. FUTERMAN:
11   Q    Good morning, Doctor.  I just have a few questions.
12        Just so I'm clear, ethylone, prior to March 2014, was
13   not a controlled substance; is that correct?
14   A    That's correct.
15   Q    So, it would not be illegal to import ethylone prior to
16   March 2014; correct?
17   A    It wouldn't be a controlled substance.
18   Q    Thus, it wouldn't be illegal to import it from
19   anywhere; correct?
20   A    The legality I couldn't speak to.  It may be considered
21   an analogue.  There are other charges that could be -- it's
22   not scheduled.  That's what I can speak to.
23   Q    March 2014?
24   A    Correct.
25   Q    And you're unaware that in Mr. Chauca's case how much
```

```
 1   of ethylone he imported prior to March 2014; correct?

 2   A    I have no knowledge of it -- any of that, no.

 3           MR. FUTERMAN:  Judge, I have nothing further.

 4           THE COURT:  All right, thank you.

 5                       CROSS-EXAMINATION

 6   BY MR. ANDERSON:

 7   Q    Dr. Willenbring, good morning.

 8   A    Good morning.

 9   Q    Dr. Willenbring, let's go back to the difference

10   between ethylone and MDEA.  There is a significant

11   difference.  It's the beta ketone atom; isn't that correct?

12   A    That's the difference, yes.

13   Q    That's the difference.  And that's a significant

14   difference, isn't it?

15   A    The significance of the difference is that there's a

16   difference.  If they were the same, then I wouldn't need to

17   be here, they would be the same thing.  So, there has to be

18   some difference for them to be substantially similar.

19   Q    And you previously testified that ethylone is a

20   cathinone and MDEA -- MDEA is an amphetamine; isn't that

21   correct?

22   A    That's correct.

23   Q    And that's based upon the beta ketone atom that is

24   different in the two substances; isn't that correct?

25   A    Yes.
```

1   Q    Okay.

2        Now, you're not aware of any difference between

3   methylone and ethylone, are you?

4   A    There is a difference between methylone and ethylone.

5   Their chemical structures are different (nodding head).

6   Q    But we're not talking about something as significant

7   as, say, a beta ketone atom; we're talking about maybe one

8   or two carbons?  Isn't that correct?

9   A    There is one carbon and two hydrogens that distinguish

10  ethylone from methylone.

11  Q    And your experience concerning this particular drug is

12  you don't know the potency that it would have on a human as

13  compared to -- of ethylone as compared to, say, methylone or

14  MDEA, because the tests really haven't shown the comparisons

15  or differences in humans that would be able to show us what

16  the effect would be on it; isn't that correct?

17  A    I can't speak to the effect on humans.  That's a

18  pharmacology question.

19  Q    Okay.

20       Now, part of your job is working with the scheduling of

21  the new drugs from the chemistry side; isn't that correct?

22  A    That's correct.

23  Q    All right.  And as stated, you are familiar with the

24  Controlled Substances Act; correct?

25  A    Yes.

```
 1   Q     And do you work with it regularly?

 2   A     Yes.

 3   Q     Okay, and you're aware of the controlled substance

 4   butylone; correct?

 5   A     Yes.

 6   Q     And prior to March 14th, that's when that became a

 7   scheduled controlled substance, in March 2014; isn't that

 8   correct?

 9   A     Correct.

10   Q     All right.  Before butylone was scheduled, ethylone was

11   treated under the same analogue as methylone under the

12   Controlled Substances Act; isn't that correct?

13   A     If it was intended for human consumption, it may be

14   considered an analogue of methylone.

15   Q     So, that would be a yes?

16   A     That's -- I can't speak to whether or not it is an

17   analogue because that's a determination a court would have

18   to make.

19   Q     But it was previously charged as an analogue of

20   methylone; isn't that correct?

21   A     It may have been.

22   Q     Didn't you previously testify to that before His Honor,

23   Judge Merryday, back in February of this year?

24   A     I -- at the time, I said I believe it was charged as

25   that.  I can't recall a specific case where it was.
```

```
 1  Q    Was ethylone ever a ketone, Dr. Willenbring?  Was it
 2  ever considered --
 3  A    I don't understand that question, I'm sorry.
 4  Q    If you take a look at ethylone and MDEA at each
 5  other -- let's ask this:  Was MDEA ever classified as a
 6  ketone?
 7  A    So, a ketone is a functional group.
 8  Q    Uh-huh.
 9  A    You don't usually classify things as -- I mean, the
10  ethylone has a ketone, and MDEA does not.
11  Q    Okay, and that's what makes the difference between
12  ethylone being a cathinone and MDEA being an amphetamine;
13  correct?
14  A    Correct.  The amphetamine core structure is in MDEA,
15  and it's also in ethylone.  So, when you add that beta
16  ketone group to the amphetamine structure, it becomes a
17  cathinone.  So, both are considered amphetamines.  Ethylone
18  is also considered -- you can subclassify it as a cathinone.
19          MR. ANDERSON:  Just a minute, Your Honor.
20          (Pause while Mr. Anderson confers with a person in
21  the audience.)
22          MR. ANDERSON:  Judge Honeywell, I tender the
23  witness.
24          MR. ANGELIS:  I don't have any questions of this
25  witness.
```

```
 1              THE COURT:  All right, no questions from
 2  Mr. Angelis.
 3              Mr. Scriven.
 4              MR. SCRIVEN:  Yes, Your Honor.
 5                        CROSS-EXAMINATION
 6  BY MR. SCRIVEN:
 7  Q     Dr. Willenbring, you testified that ethylone is a
 8  positional isomer of butylone; correct?
 9  A     That's correct (nodding head).
10  Q     And you previously defined an isomer as essentially two
11  substances that have the same core structure and the same
12  atoms in different positions?
13  A     That's part of it, yes.  Yeah.
14  Q     Okay.  Now, how would you distinguish a positional
15  isomer from just an isomer?
16  A     So, the -- the language in the Controlled Substances
17  Act, an isomer is -- has to do with the 3D position of the
18  substituents, so it's called an "optimal isomer," so all the
19  atoms would be in the same positions.  They'd be connected
20  in the same manner.  They would just be in a different 3D
21  arrangement.
22         In a positional isomer, you actually have to, you know,
23  remove an atom and place it somewhere else to become a
24  positional isomer.
25  Q     So, what effect does a functional group have in
```

1   determining whether an isomer is an optical isomer versus a

2   positional isomer?

3   A    The functional groups come into play in the definition

4   of a positional isomer.  You can't create or destroy

5   functional groups for the definition of a positional isomer.

6   Q    Okay.  So, for the purpose of a definition of

7   "positional isomer," the functional group such as the beta

8   ketone here would be significant?

9   A    Well, the beta ketone is a different atom, so already

10  it can't be a positional isomer because MDEA only has two

11  oxygen atoms, and ethylone has three.  So, they would not be

12  considered positional isomers just for that different

13  reason.  They have different atoms.

14  Q    Okay.  And you testified that the only difference

15  between MDEA and ethylone is the ketone; correct?

16  A    Yes, the red portion on this slide, the beta-keto

17  group.

18  Q    Okay.  And despite that, it was your opinion that the

19  substances ethylone and MDEA would be still substantially

20  similar despite the fact that ethylone contains the beta

21  ketone; correct?

22  A    Yes (nodding head).

23  Q    Okay, and how would you define "substantially similar"

24  scientifically?

25  A    It's not a scientific definition.  It's a plain English

```
 1   definition.
 2   Q    Okay.  So, what would you -- so, what factors are you
 3   using then in making that -- or, you know, offering that
 4   opinion that they're substantially similar?
 5   A    So, the definition that I use is "a largely but not
 6   completely common arrangement of atoms and bonds in a
 7   molecule," and the methodology that I use is I go through
 8   the structures.  I look at the core structure.  I look at
 9   what's substituted on the core structure and where it's
10   substituted; and in this case, the core structure is the
11   same.  All of the substitutions are in the same place at the
12   same positions, and they're the same substitutions, with the
13   exception of that one beta-keto.  That's the only
14   difference.
15   Q    So, basically your opinion is based on the fact that
16   they sort of look alike when you draw 'em all out?
17   A    That's not at all what I said.
18   Q    Okay, but essentially -- in the slide, it -- it
19   basically showed that they're -- they have all of the
20   groupings in the same location virtually with the exception
21   of the oxygen on the -- on the -- the oxygen; correct?
22   A    They have the same core structure.  They have the same
23   substitutions on that core structures, and those
24   substitutions are in the same positions with the exception
25   of the difference.
```

 1    Q    Okay, but you can't testify as to what effect that

 2    difference would have, correct, or the effect that -- that

 3    ketone in ethylone, you can't testify as to what -- how that

 4    would impact, I guess, the pharmacology of that -- of

 5    ethylone versus MDEA?

 6    A    That would be the pharmacologist that would testify

 7    about that, yes.

 8         MR. SCRIVEN:  Just a moment, Your Honor.

 9         (Pause while Mr. Scriven confers with a person in

10    the audience.)

11         MR. SCRIVEN:  Your Honor, I pass the witness.

12         THE COURT:  All right, thank you.

13         Mr. Lopez.

14                    *CROSS-EXAMINATION*

15    BY MR. LOPEZ:

16    Q    Good morning, doctor.

17    A    Good morning.

18    Q    Briefly, Doctor, just so we understand in a very

19    simplified fashion for us laypeople, it's the atoms and the

20    bonds being substantially similar which causes you to render

21    the opinion you're rendering here today?

22    A    The opinion is with regards to the chemical structure,

23    and the chemical structure is made up of the atoms and the

24    bonds for the molecule.

25    Q    All right.  And as you testified, you are not in a

1  position or it's not your expertise to testify as to the

2  effects of either one on the central nervous system?

3  A    Correct.

4  Q    And so, you could not testify that having the XB beta

5  carotene atom on ethylone rather than MDEA might make it

6  less potent or maybe more diffuse?  You cannot testify to

7  that; is that correct?

8  A    I think those words mean different things, but no, I

9  can't testify about the potency.

10         MR. LOPEZ:  All right, thank you.

11         No other questions.

12         THE COURT:  All right, thank you.

13         Miss Peluso, redirect?

14         MS. PELUSO:  No further questions.

15         THE COURT:  Let me just ask, Dr. Willingbring

16  [sic], let me make sure that I understand -- Willenbring,

17  excuse me.

18         When you were deciding which substance to compare

19  for purposes of the sentencing guidelines -- and here in

20  this case we're looking at ethylone and MDEA -- did you look

21  at other controlled substances; or based upon what you knew

22  of ethylone, did you automatically go to MDEA because of

23  their similarities?

24         THE WITNESS:  I considered everything in the

25  guidelines.

1          THE COURT:  Okay.  So, you considered MDMA as

2  well?

3          THE WITNESS:  I did.  MDEA has more substitutions

4  in common with ethylone than does MDMA.  So, there are more

5  differences, if you want, between them.

6          THE COURT:  There are more differences between

7  ethylone and MDMA than there are between ethylone and MDEA?

8          THE WITNESS:  That's correct.

9          THE COURT:  Okay.

10         Do any of you have any questions based upon my

11  questions of this witness?

12         MR. FUTERMAN:  No, Your Honor.

13         MR. ANDERSON:  No, Your Honor.

14         MR. ANGELIS:  No, Your Honor.

15         MR. LOPEZ:  No.

16         MR. SCRIVEN:  No, Your Honor.

17         THE COURT:  All right, thank you, sir.  You may

18  return to your seat.

19         Miss Peluso, you may call your next witness.

20         MS. PELUSO:  Cassandra Prioleau.

21         (The witness was duly sworn or affirmed and

22  responded as follows:)

23         THE WITNESS:  I do.

24         THE CLERK:  Please state your name and spell your

25  last name for the record.

```
 1              THE WITNESS:  Cassandra Prioleau.  My last name is
 2   P, as in "Paul," R-I-O-L-E-A-U.
 3              THE COURT:  You may inquire.
 4                        CASSANDRA PRIOLEAU,
 5   the witness, being sworn or affirmed, testified as follows:
 6                         DIRECT EXAMINATION
 7   BY MS. PELUSO:
 8   Q    Dr. Prioleau -- it's "Prioleau"?
 9   A    Prioleau (pronounced "Pray low") or Prioleau
10   (pronounced "Pree low").  It's up to you, but I normally
11   pronounce it Prioleau (pronounced "Pree low").
12   Q    That's what we'll stick with today then.
13        Doctor, you currently work for the Drug Enforcement
14   Administration?
15   A    Yes.
16   Q    Can you tell us what you do for the DEA?
17   A    My title is drug science specialist, but I am a
18   pharmacologist by training.
19   Q    And where do you work in the DEA?
20   A    I work in the drug and chemical evaluation section, as
21   does my colleague, Dan Willenbring.
22   Q    And what are your specific duties as a pharmacologist
23   in that section?
24   A    Some of my duties are I monitor emerging drugs for drug
25   abuse potential, that is, the likelihood that they will be
```

1  abused.  I evaluate -- I review the pharmacology of emerging

2  drugs and known drugs of abuse like cocaine and

3  methamphetamine, and I also review the pharmacology of

4  emerging drugs for scheduling under the Controlled

5  Substances Act.

6  Q    Okay.  So, basically all of that together you do as a

7  pharmacologist?

8  A    Yes.

9  Q    And how long have you been working with the DEA?

10  A    Since October of 2008.

11  Q    And can you describe to the court your education and

12  your training and your experience that qualifies you to do

13  your job at DEA as a pharmacologist?

14  A    Yes.  I have a Bachelor of Science degree in chemistry

15  from the University of Connecticut.  After that, I obtained

16  a Ph.D. in pharmacology from the University of

17  North Carolina.  Then I did a post-doc at Mount Sinai

18  Hospital in New York, where I did basic research.  After

19  that, I did a second post-doc at the Salpetriere Hospital in

20  Paris, France.

21  Q    And can you tell the court exactly what pharmacology

22  is?

23  A    So, basically pharmacology is the study of how drugs

24  work in the body.

25  Q    Okay, and you -- you use that specialty when you're

```
 1   doing your job at the DEA?

 2   A    Yes (nodding head).

 3   Q    In other words, you research the effects of drugs on

 4   the human body?

 5   A    Yes.

 6   Q    And when you do that, are you called upon to compare

 7   the effects on the human body of particularly some drugs

 8   that are controlled substances, comparing them to other

 9   drugs that are controlled substances?

10   A    Yes.

11   Q    Okay, and do you do that -- what percentage of your job

12   is doing that?

13   A    Probably 75 percent.

14   Q    And have you ever testified in court before or been

15   called upon to compare one controlled substance to another

16   as far as their relative effects on the human body?

17   A    Yes.

18   Q    And the effects on the human body, would that basically

19   be on the central nervous system in the human body?

20   A    Yes.

21   Q    And do you know approximately how many times you've

22   testified in that regard in federal district court?

23   A    I don't know the exact number, but it's over a dozen

24   times that I've testified in federal court.

25   Q    Okay, and have any of those occasions included the
```

```
 1  comparison of the pharmacology of ethylone with other

 2  controlled substances?

 3  A    Yes.

 4  Q    Okay.  And how many times have you done that?

 5  A    This is my fourth time.

 6  Q    Your fourth time?

 7  A    Correct.

 8  Q    And similar to Dr. Willenbring, you testified in a case

 9  in southern Florida with Judge King; correct?

10  A    Yes.

11  Q    And then again with -- recently with Judge Merryday in

12  this courtroom?

13  A    Yes.

14  Q    Okay.  And then you recently testified in Fort Myers

15  last week regarding this?

16  A    Yes (nodding head).

17  Q    And that was all regarding ethylone?

18  A    Yes.

19  Q    So, when you're reviewing information concerning

20  pharmacology of different controlled substances and

21  comparing 'em, what type of studies do you review in order

22  to make those comparisons?

23  A    I look for all different types of studies that use the

24  drug in question, and some of these include in vitro

25  studies.  Some of these include in vivo studies and any
```

1  information, if available, of -- for example, somebody

2  called in and had a relevant information regarding the

3  substance in question.

4  Q    Can you tell the court what an in vitro study involves?

5  A    So, in vitro studies are studies done outside of a

6  living being; and, for example, studies done in test tubes

7  are an example -- are examples of in vitro studies.

8  Q    Okay, and how -- how does an in vitro study tell you --

9  or what do they tell you with regard to the pharmacology of

10 a particular substance?

11 A    From the in vitro study, what I can gain from that is

12 an understanding of how the drug is likely to work in the

13 body.

14 Q    Okay, and --

15        MS. PELUSO:  I'd ask the court's indulgence just a

16 moment.

17        (Pause.)

18 BY MS. PELUSO:

19 Q    Do in vitro studies -- it tells you like the likely

20 effect on the central nervous system, correct, or what parts

21 of the central nervous system might be affected by that

22 drug?

23 A    Yes, how it's working, the mechanism of action, what

24 type of protein it's likely to target in the -- in the body

25 to cause the effect that it's -- it likely is to have.

```
 1   Q    Okay, and by effect on the central nervous system, are
 2   there different types of effects that you're targeting or
 3   you're trying to determine on a particular drug?
 4   A    It depends on what type of drug it is and what I
 5   suspect -- the type of pharmacological effects it may have.
 6   Q    And you're familiar with the terms like
 7   "hallucinogenic" or "depressant" or "stimulant effect";
 8   correct?
 9   A    Correct.
10   Q    And are those the three or the main factors that you're
11   looking for as to what particular effect a drug has on the
12   central nervous system?
13   A    In regards to the Controlled Substances Act, yes.
14   Q    And do in vitro in the test tube studies tell you
15   whether or not a particular drug will have an effect on
16   either of those three central nervous system factors?
17   A    It gives you information that stimulants, depressants,
18   and hallucinogenics have certain types of effects, the
19   mechanism of how they work; and so, what you want to check
20   to see if in this in vitro study, does it -- is it
21   consistent with other drugs that are in that category, so
22   does it have a similar type of effect in that in vitro
23   assay.
24   Q    Okay, and did you rely on any in vitro testing in
25   comparing ethylone with any other controlled substance?
```

```
 1   A      Yes.
 2   Q      And did you make any determinations on whether or not
 3   any other named controlled substances in the sentencing
 4   guideline was comparable in its effect on the central
 5   nervous system based on just in vitro tests?
 6   A      Not just based on the in vitro study.  I had to use all
 7   the available pharmacology data that I can find to make --
 8   to render my opinion on its effects.
 9   Q      Okay.  Well, then let's just discuss the other studies
10   that you would have relied on.  I think before you mentioned
11   in vivo.  Can you describe to the court the difference
12   between in vitro and in vivo studies?
13   A      So, in vivo studies are studies that are done in a
14   living being.
15   Q      And what type of living beings?
16   A      A living being can be a rat, a mouse, birds, humans.
17   Q      Okay, and what does -- what does conducting in vivo
18   tests -- how reliable are they on, say, an animal versus a
19   human in predicting the pharmacological effects on a human
20   being?
21   A      They give you information on -- it's likely that the
22   mechanism or the effect that you see in the animal,
23   depending on the study -- you know if that study -- if you
24   can extrapolate the information from that study to humans;
25   and there are certain studies where it's shown that you can
```

```
 1  extrapolate information that you have from that study to
 2  humans.
 3  Q    Okay, and are there certain types of controlled
 4  substances that you just do not test on human beings?
 5  A    Substances that are known to be dangerous or are likely
 6  to be dangerous you would most likely not test on a human.
 7  Q    So, in those cases, if in vivo studies were to be done,
 8  they would most likely be done on an animal like a rat or
 9  some other animal?
10  A    Correct.
11  Q    Okay, and do you know whether or not ethylone is
12  considered to be one of those substances where it would be
13  too dangerous to conduct on a human being?
14  A    I've not located any studies where in vivo is tested in
15  humans; and based on the pharmacology information that I
16  knew -- that I do know about this substance, it's likely
17  that it would be too dangerous to test on humans.
18  Q    And could the same be said for methylone?
19  A    Correct (nodding head).
20  Q    Okay, and do you know whether or not any -- other than
21  on humans, whether any in vivo tests have been done with
22  regard to ethylone?
23  A    I've not located any studies in which ethylone was
24  tested in vivo in humans or in rats or in mice.
25  Q    Okay, but you are familiar with whether or not
```

```
 1  methylone has been tested in vivo in -- in some

 2  circumstances?

 3  A    Yes.  Methylone has been tested in in vivo studies.

 4  Q    In humans?

 5  A    Not in humans.  In rats or mice.

 6  Q    Okay.  So, there is no in vivo studies that you could

 7  rely on with regard to ethylone that you know of that you

 8  could rely on to predict the effect on the central nervous

 9  system for ethylone?

10  A    Correct (nodding head).

11  Q    What about with regard to in vitro studies with regard

12  to ethylone?

13  A    I did locate a study in which MDEA was tested in an

14  in vitro -- I mean, ethylone was tested in an in vitro

15  study.

16  Q    And what about MDEA?

17  A    MDEA was also tested in that same study.

18  Q    Okay, and have you compared and examined the in vitro

19  studies as they pertain to both MDEA and ethylone?

20  A    Yes.

21  Q    And is there any comparative data between those two

22  types of studies that could allow you to form an opinion

23  regarding potential for similar effects on the central

24  nervous systems of those two substances?

25  A    Well, based on the in vitro study and another --
```

```
 1  another study which we've not talked about, which is a
 2  structure activity relationship analysis which I performed
 3  on ethylone, I was able to render an opinion on the effects
 4  of ethylone.
 5  Q     Compared to MDEA?
 6  A     Yes.
 7  Q     Okay.  And before we go to that final conclusion and
 8  why, let's discuss -- you said something about SAR studies.
 9  What are those?
10  A     "SAR" stands for "structure activity relationship," and
11  it's a type of analysis that you do where you look at the
12  structure of -- of a substance -- an unknown substance and
13  predict the pharmacological characteristics of that
14  substance.
15  Q     Okay, and you said that you've been able to conduct
16  that on ethylone as well as MDEA?
17  A     I conducted it on ethylone based on its core structure
18  which my colleague, Dr. Willenbring, spoke of.
19  Q     Okay, and did you form an opinion then based on your
20  review of those in vitro studies as to whether or not the
21  effect on the central nervous system of ethylone is
22  substantially similar to the effect on the central nervous
23  system as MDEA?
24  A     Yes, I have an opinion on that.
25  Q     And what is that?
```

1  A    Based on all the available pharmacology data, ethylone

2  is expected to have a stimulant effect on the central

3  nervous system that is substantially similar to that of

4  MDEA.

5  Q    And you said "stimulant effect."  What about the other

6  effects of the -- on the central nervous system, the

7  depressant or the hallucinogenic?

8  A    In terms of the depressant effect -- a depressant

9  effect is the opposite of a stimulant effect, and it appears

10 that it has the characteristics of having a stimulant

11 effect; and the hallucinogenic effect has not been tested

12 for ethylone to render an opinion on its hallucinogenic

13 effects.

14 Q    But there has been such a test on MDEA?

15 A    Yes.

16 Q    Okay.  But because there's no data available on

17 ethylone, you can't compare it to MDEA regarding the

18 hallucinogenic effect?

19 A    Correct.

20 Q    Okay, now --

21       I'd ask the court's indulgence for just a moment.

22     (Pause.)

23 BY MS. PELUSO:

24 Q    Now, you're specifically familiar -- let me back this

25 up.  As part of your duties, are you called upon to conduct

```
 1  similar -- similarity conclusions and opinions based on
 2  substances that are not named in the sentencing guidelines
 3  and compare them to substances that are named in the
 4  guidelines?  Is that part of your duties?
 5  A    Yes.
 6  Q    Okay.  And in this case, I think we've heard testimony
 7  already that ethylone is not named in the sentencing
 8  guidelines?
 9  A    That's correct (nodding head).
10  Q    And but MDEA is?
11  A    Correct.
12  Q    Okay, and you just based your opinion, for the purpose
13  of the sentencing guidelines, that they have -- that they're
14  substantially similar in their pharmacological effect on the
15  body or on -- on the central nervous system?  Did I say that
16  correctly?  I'm sorry.  I will repeat that.
17  A    I didn't hear the question.
18  Q    All right.  So, you -- you earlier said you based an
19  opinion based on the in vitro and SAR studies that ethylone
20  has a substantially similar effect on the central nervous
21  system as MDEA has?
22  A    Is expected to have a --
23  Q    Oh, expected?
24  A    Yeah, a stimulant effect on the central nervous system
25  that is substantially similar.
```

1    Q     But because there's no in vivo studies done on

2    ethylone, you can't make that same conclusion?  You can't go

3    from expected to yes, it will be have the same effect?

4    A     Correct.  I need more data in order to have a more

5    definite opinion on the pharmacological effects of ethylone

6    as compared to MDEA.

7    Q     And what type of additional data would you have to have

8    to make that conclusion?

9    A     A useful study would be an in vivo study, and a

10   particular study would be a drug discrimination study, and

11   this would -- and this study compares the effects of a known

12   drug to that of an unknown drug.

13   Q     And that hasn't been done with regard to ethylone?

14   A     No.

15   Q     Okay.

16         Can you tell -- what type of tests would be needed in

17   order to determine -- I think the term "potency" is used,

18   but I think the actual term in the sentencing guidelines

19   is -- do you have any studies that could tell you whether or

20   not ethylone -- the same amount of ethylone or a lesser

21   amount of ethylone would be needed to have the same effects

22   on the central nervous system as MDEA?

23   A     I could locate no studies that could give me that

24   information.

25   Q     What -- okay, can you explain that?

1   A    There are studies -- if you had a human body study

2   where it was tested in a human, you could determine what the

3   potency is or whether a lesser or greater amount of one drug

4   is needed to produce the same pharmacological effect as

5   another drug.

6        There's also the in vivo study that I talked about.

7   The drug discrimination study, which has been determined

8   by -- it's widely accepted by the scientific community that

9   what you see in this in vivo drug discrimination study is

10  what you're likely to see in a human.  So, in that study I

11  would be able to extrapolate not only the effect of the

12  substance, but also I would be able to get an estimate of

13  the relative potency of an unknown substance compared to a

14  known substance.

15  Q    And that just simply cannot be done, in your opinion,

16  in this case with regard to ethylone as compared to MDEA?

17  A    No.

18  Q    And just to ask one more question with regard to

19  ethylone, did you make any attempts to compare ethylone

20  regarding the physiological effects of ethylone?  Did you

21  make any comparisons to other named controlled substances

22  such as MDEA?

23  A    I did not, but it -- I could if I was asked to.  Along

24  with the chemists, we pick which we believe is the substance

25  to compare it to that's the chemical that's listed in the

```
 1  sentencing guideline.

 2  Q    Okay.  So, you chose MDEA based on your discussions

 3  with Dr. Willenbring?

 4  A    Correct, yes.

 5  Q    Okay.

 6       And have you ever been called upon -- maybe I just got

 7  that answer already, but I can't recall -- called upon to

 8  actually compare the pharmacological effects on -- of

 9  ethylone to MDMA?

10  A    No, I have not.

11            MS. PELUSO:  I have no further questions.

12            THE COURT:  All right, thank you.

13            All right, cross-examination, Mr. Futerman?

14            MR. FUTERMAN:  Thank you, Judge.  I have no

15  questions.

16            THE COURT:  Thank you.

17            Mr. Anderson?

18            MR. ANDERSON:  Thank you, Judge.

19                      CROSS-EXAMINATION

20  BY MR. ANDERSON:

21  Q    Dr. Prioleau, good morning.

22  A    Good morning.

23  Q    Dr. Prioleau, you previously testified that, and

24  Miss Peluso asked you on direct, that ethylone, like MDEA,

25  based upon a study that you -- your own study that you
```

```
 1   conducted, is expected to have a stimulant effect on the

 2   human body; isn't that correct?

 3   A    Is -- ethylone is expected to have a stimulant effect

 4   on the central nervous system that is substantially similar

 5   to that of MDEA.

 6   Q    Okay.  And you testified that MDEA has an

 7   hallucinogenic effect on the central nervous system, but

 8   then you also admitted that there is no available

 9   information determining whether or not ethylone would have

10   an hallucinogenic effect on the nervous system; isn't that

11   correct?

12   A    Correct.

13   Q    Okay.  And you also testified that there is no reliable

14   information to determine whether ethylone would have a

15   lesser or greater effect on the central nervous system, and

16   you don't even know how much of the drug is actually needed

17   to produce a substantially similar effect on the central

18   nervous system; isn't that correct?

19   A    Correct.

20   Q    You also testified that there is no actual scientific

21   data available that can draw any kind of conclusion

22   regarding the potency of ethylone on a human user; isn't

23   that correct?

24   A    Correct.

25   Q    And you testified that in vitro studies does not
```

```
 1   provide information as to whether a greater or lesser amount

 2   of ethylone would be needed to produce a substantially

 3   similar stimulant effect on the nervous system as does MDEA;

 4   isn't that correct?

 5   A    Correct, in a user (nodding head).

 6   Q    And "in vitro" basically means that it's tested on a

 7   live subject?

 8   A    "In vivo" or "in vitro"?

 9   Q    Excuse me.  "In vivo" means a live subject, but what

10   does "in vitro" mean?

11   A    "In vitro" is testing outside of a living being, so

12   it's not done in a live subject.

13   Q    Okay.

14        Now, you previously testified that the drug methylone

15   is similar to ethylone in that it has the addition of the

16   ketone group; isn't that correct?

17   A    I didn't testify to that, but it has --

18   Q    You didn't?

19   A    It has, as my colleague was talking about, the beta-

20   keto group.

21   Q    Okay.  Now, you previously testified before His Honor,

22   Judge Merryday, back in February, and you were asked

23   specifically under oath, "Would you agree that methylone is

24   similar to ethylone and that is in addition to the ketone

25   group?" and you stated, "Yes.  Methylone has a ketone group
```

```
 1   just like ethylone."  Do you remember --

 2   A     Yeah.  I thought you meant for this morning.

 3   Q     But you previously testified to that?

 4   A     Correct, yes.

 5   Q     And you also testified that methylone has been tested

 6   in both in vitro and in vivo studies; correct?

 7   A     Yes.

 8   Q     And you testified here to that to some degree on direct

 9   when Miss Peluso was asking you that?

10   A     Yes.

11   Q     Okay, and you said it was tested on a lab rat or lab

12   mouse or something like that?

13   A     Yes.

14   Q     Okay, and isn't it true that the potency of methylone

15   was found to be half the potency of the drug MDMA?

16   A     Based on the in vivo drug discrimination study, it was

17   found to be half as potent.

18   Q     Okay, and MDEA has been known to have -- was agreed to

19   be similar to methylone, isn't that correct, or basically

20   they use that in charting on the guidelines -- they use MDMA

21   to chart what methylone could be charted as as far as the

22   conversion table; isn't that correct?

23   A     Methylone is compared to MDMA.

24   Q     MDMA, that's correct.

25         And the effect of methylone was shown in studies as
```

1  having a cocaine-like effect on the body similar to MDMA;

2  isn't that correct?

3  A    It was -- methylone has a stimulant effect on the

4  central nervous system.

5  Q    But, again, we don't know what effect that ethylone

6  would have on the human body because there's no studies

7  relating to that, do we?

8  A    Based on all the available pharmacology data, I can say

9  it's expected to have a stimulant effect.

10 Q    But, again, you just testified that there is no

11 scientific data that would merit that?

12 A    Correct.  That's why I say it's expected to.

13 Q    Okay.  Now, would you agree with me that methylone and

14 ethylone are basically similar in their potencies, that

15 one -- they may have similar potencies that are the same in

16 some areas and in other areas methylone might be greater and

17 in some areas ethylone might be greater?

18 A    I don't have any data on ethylone to make that opinion.

19 Q    Okay, but would you agree that they are similar types

20 of drugs, particularly because they have the ketone group

21 that makes them similar?

22 A    They both would -- ethylone is expected to have a

23 stimulant effect, and we know that methylone does have a

24 stimulant effect on the central nervous system.

25 Q    Now, when you did your structural -- structural

```
 1   activity relationship, did you prepare a written document
 2   for that?
 3   A    It's in my Rule 16 summary, and I go through the
 4   reasons my -- the basis for my opinion, which has the
 5   structure activity relationship analysis.
 6   Q    Okay.  And basically it's more of a prediction or a --
 7   basically it's a hypothesis basically?  There's nothing --
 8   you don't have any actual data; you're just predicting
 9   something given your educated hypothesis or educated guess?
10   Isn't that correct?
11   A    I'm doing a prediction it's expected to have.
12   Q    Okay, and this test isn't based on any testing again of
13   humans, it's based on testing of a lab rat; and you'd have
14   to agree that the equations or makeups of a human would be
15   completely different from that of something like a lab rat
16   or a mouse?
17   A    Are you talking about the structural activity
18   relationship analysis or --
19   Q    Yes.
20   A    The foundation of it is based on actual experiments
21   that were done in humans as well as in animals because the
22   amphetamine core structure has been well studied for
23   decades, and they -- because amphetamine is a Schedule II,
24   they actually have data on what type of effects that
25   amphetamine has in humans as well as in animals.
```

```
 1        So, when you do the structure activity relationship

 2  analysis, they -- there may be studies where they have

 3  verified that these types of substitutions -- what type of

 4  effects do they have on activity:  If you retain activity,

 5  if you eliminate activity, or if it you reduce activity.

 6  So, the structure activity relationship analysis is grounded

 7  in studies that have been done in the past.

 8  Q    Did you ever look at the Simmler study, S-I-M-M-L-E-R,

 9  when making this determination?

10  A    Yes.

11  Q    Okay.  What about the Eschelman study, E-S-C-H-E-

12  L-M-A-N?  Did you ever look at that study?

13  A    Yes.

14  Q    And are those in vitro studies or in vivo studies?

15  A    Those are in vitro studies.

16  Q    And did you look at or study transporters such as

17  dopamine, serotonin, or -- I don't want to mess this up --

18  norepinephrine?

19  A    Norepinephrine.

20  Q    Norepinephrine?

21  A    Those are what those studies, the Eschelman and Simmler

22  studies -- they used -- they tested those transporter

23  systems that you just mentioned.

24  Q    And these are all stimulants that can affect the

25  central nervous system; correct?
```

```
 1   A     They are an in vitro model system on what is -- they
 2   mimic the central nervous system, but they're done in vitro,
 3   outside of a living being.
 4   Q     Now, you would agree with me in classifying it, that
 5   ethylone was actually at one point a designer drug from the
 6   phenethylamine class; isn't that correct?  I hope I'm saying
 7   that right.
 8   A     Yes.  It's phenethylamine.
 9   Q     And methylone is also a designer drug from the same
10   class; isn't that correct?
11   A     Yes.
12   Q     Okay.  And methylone also binds dopamine, serotonin,
13   and that word I just could not state a few minutes ago?  It
14   combines all three of them and inhibits the intake?
15   A     Correct.
16   Q     And ethylone, as was stated earlier here by
17   Dr. Willenbring, is a cathinone; correct?
18   A     Excuse me?  Ethylone or --
19   Q     Ethylone is a cathinone?
20   A     Yes.
21   Q     And methylone is also classified as a cathinone -- or
22   cathinone?
23   A     Yes.
24             MR. ANDERSON:  Just a moment, Your Honor.
25             (Pause while Mr. Anderson studies his notes.)
```

```
 1              MR. ANDERSON:  Dr. Prioleau, thank you.  I have no

 2   further questions.

 3              Your Honor, I tender the witness.

 4              THE COURT:  All right, thank you.

 5              MR. ANGELIS:  I have no questions.

 6              THE COURT:  All right, no question from

 7   Mr. Angelis.

 8              Mr. Scriven?

 9              MR. SCRIVEN:  Your Honor, I have no questions.

10              THE COURT:  All right.

11              Mr. Lopez?

12              MR. LOPEZ:  No questions, Your Honor.

13              THE COURT:  All right, thank you.

14              Miss Peluso, redirect?

15                      REDIRECT EXAMINATION

16   BY MS. PELUSO:

17   Q    Just to clarify a few points:  Again, I just want to

18   clarify, is there any data available to compare the potency

19   in a user of methylone and ethylone?

20   A    No.

21   Q    In an ultimate user?

22   A    No.

23   Q    Not at all?

24   A    No.

25   Q    Okay.
```

1        When you have used what you call the "SAR studies" in

2   the past on other cases and you -- like you testified today,

3   you said additional studies like in vivo studies would be

4   needed in order to get an expected effect into an actual

5   effect?  Did I characterize that right?

6   A    Yes.

7   Q    In the past when you had the SARs first and you made a

8   predicted effect as to some of those substances, did you

9   ever then eventually get in vivo or I think you called it

10  the diffusional something -- or some other test that

11  actually verified the results or your predictions from the

12  previous test?

13  A    Yes.

14  Q    Okay.  And so, we don't have that in this case?

15  A    No.

16           MS. PELUSO:  No further questions.

17           THE COURT:  All right, thank you.

18           Thank you, ma'am.  You may return to your seat.

19           Miss Peluso, any there any other witnesses on

20  behalf of the government?

21           MS. PELUSO:  May I consult?

22           THE COURT:  Yes.

23           (Pause while Mr. Peluso confers with the agents.)

24           MS. PELUSO:  No further questions -- or no further

25  witnesses, Your Honor.

```
 1              THE COURT:  Thank you.
 2              I know at least one witness is testifying on
 3  behalf of defendants.  That's Dr. Dudley.  Are there any
 4  other witnesses testifying on behalf of the defendants
 5  today?
 6              MR. ANDERSON:  I don't believe so, Your Honor, no.
 7              THE COURT:  All right, we'll be in recess for ten
 8  minutes, and then I'll come back and start with the
 9  defendants.
10              COURT SECURITY OFFICER:  All rise.
11              (Recess from 11:09 a.m until 11:20 a.m.)
12              THE COURT:  All right, counsel, are we ready to
13  resume?
14              MR. ANDERSON:  We are, Your Honor.
15              THE COURT:  Mr. Anderson, would you like to make a
16  short statement before calling your first witness?
17              MR. ANDERSON:  Judge, actually I would maybe like
18  to make the statement at the end.
19              THE COURT:  Okay.
20              MR. ANDERSON:  Judge, on behalf of Mr. Cruz and
21  the other gentlemen who are charged here today before you
22  for sentencing, defense would call Dr. Gregory Dudley.
23              THE COURT:  Okay.
24              (The witness was duly sworn or affirmed and
25  responded as follows:)
```

```
 1              THE WITNESS:  Yes, I do.
 2              THE CLERK:  Please state your name and spell your
 3   last name for the record.
 4              ALL WITNESSES:  Gregory Dudley, D-U-D-L-E-Y.
 5              THE CLERK:  Thank you.  You may be seated.
 6              THE COURT:  You may inquire.
 7              MR. ANDERSON:  Thank you, Your Honor.
 8                        DR. GREGORY DUDLEY,
 9   the witness, being sworn or affirmed, testified as follows:
10                        DIRECT EXAMINATION
11   BY MR. ANDERSON:
12   Q    Good morning, sir.
13   A    Good morning.
14   Q    Dr. Dudley, how do you -- where do you work, and what
15   do you do for a living specifically?
16   A    I'm a professor of chemistry and biochemistry at the
17   Florida State University in Tallahassee.
18   Q    And can you give us a little bit of information about
19   your educational background?
20   A    My educational background, I went to undergraduate -- I
21   went to undergrad at Florida State, also got my degree in
22   chemistry.  I went on to graduate school at the
23   Massachusetts Institute of Technology, where I received a
24   Ph.D. in organic chemistry; and I went on to do
25   post-doctoral research as a National Institutes of Health
```

 1  post-doctorial fellow at the Memorial Sloan Kettering Cancer

 2  Center in New York City.

 3  Q    And you stated that your doctorate is in the area of

 4  organic chemistry.  For us laypersons, could you basically

 5  describe what organic chemistry entails?

 6  A    Organic chemistry broadly defined is the study of the

 7  chemistry of the atom carbon, specifically the element

 8  carbon.  Carbon has a special place in the hearts of

 9  chemists because carbon chemistry is the foundation for

10  biochemistry for living systems.  So, we -- we have -- we

11  pay particular focus to the chemistry of carbon as a means

12  of better understanding life ourselves.

13  Q    All right, and we've heard the term -- we've heard from

14  a Dr. Prioleau, who is a pharmacologist.  Does organic

15  chemistry relate to the field of pharmacology?

16  A    Yes.

17  Q    How does it relate either similarly or in difference?

18  A    Pharmacology is the study of drugs and how they

19  interact in living systems.  The drugs specifically are most

20  typically small organic molecules, organic structures.  So,

21  ultimately, pharmacology is the study of how organic

22  chemicals and how organic chemistry plays out in the living

23  system, so how small molecules -- small organic molecules,

24  which we call drugs, interact with biomolecules in

25  biochemistry.

```
 1   Q     So, they are somewhat interrelated?

 2   A     Yes.

 3   Q     Can one be a pharmacologist without being an organic

 4   chemist?

 5   A     I would not think that one would be a pharmacologist

 6   without training in organic chemistry.  I think there are

 7   certainly specific pharmacology experiments that can be done

 8   without understanding the -- the structure of the chemistry

 9   of the substances, but I would anticipate that

10   pharmacologists have a background in organic chemistry.

11   Q     And can one be a pharmacologist -- or what is molecular

12   pharmacology as it relates to chemistry?

13   A     Molecular pharmacology is the study of how organic

14   small-molecule drugs interact in the body.  So, the specific

15   subclass, subset, of drugs that are small organic molecules.

16   Q     And you mentioned that you did some training at the

17   Sloan Kettering Institute?

18   A     Yes.

19   Q     What specifically did you do at Sloan Kettering?

20   A     I worked in the molecular pharmacology and chemistry

21   program doing basic research relating to that particular

22   lab.  The lab is broadly a medicinal chemistry lab, and I

23   worked in that lab for a little under two years.

24   Q     Were you a fellow?

25   A     I was a fellow, yes.  I received a fellowship from the
```

```
 1   National Institutes of Health.

 2   Q     How much of your education and background area is

 3   self-study?

 4   A     Since undergrad -- for undergrad, most of the

 5   training -- most of the training was classroom training in

 6   the undergraduate level.  In graduate school, I took formal

 7   course work for about half of my first year, and then that

 8   was it.  The -- the rest of the time and then through my

 9   post-doc was all self-study, reading the literature,

10   seminars, interacting with other students and faculty in the

11   programs and going to conferences, et cetera.

12   Q     Do you continue to study organic chemistry?

13   A     Yes.

14   Q     And do you continue to study the area of pharmacology?

15   A     Yes.

16   Q     And as stated before, they are basically interrelated

17   with one another?

18   A     Yes (nodding head).

19   Q     Do you or have you read any trade journals or articles?

20   A     Yes.

21   Q     Okay.  How frequently do you study and read these

22   articles?

23   A     It's cyclical.  I'd say I'm looking at the literature

24   at least every day at certain times.  For example, when

25   grant applications are being prepared, more.  So, maybe on
```

1 average, one or two papers a day, peaking at five to ten

2 papers a day, depending on what's required at that

3 particular time.

4 Q    Now, we as lawyers have something we have to do for our

5 basic requirements to maintain our licenses, which is do

6 continual studies, do course seminars in certain areas, a

7 lot of times areas that we're related in.

8      In the field that you're related in, do you do

9 continual studies in the area of organic chemistry and any

10 pharmacology?

11 A    Certainly.  I attend conferences regularly.  I present

12 at conferences.  The idea behind the conference is to get

13 different people together to exchange ideas.  I do that

14 several times a year.  We also run an active seminar program

15 at Florida State where we bring in faculty from other

16 universities to come in and give a talk on their research,

17 meet with faculty throughout the day, and then I also

18 participate in such programs for other universities where I

19 will spend a good portion of my time traveling around giving

20 presentations on our research and then spending the day

21 meeting with different faculty throughout the department or

22 departments, exchanging ideas and, in effect, catalyzing and

23 continuing each other's own knowledge base, particularly

24 looking for places of potential overlap for collaboration,

25 et cetera.

1   Q     Now, are you a full professor at Florida State

2   University?

3   A     I will be effective this fall.  My promotion has been

4   approved and will take effect in August.

5   Q     All right, and you're also tenured?

6   A     Yes.

7   Q     All right.

8         And have you done any publications, any research

9   papers, or any peer-review journals in your area -- specific

10  area of expertise?

11  A     Yes.  One of the expectations, one of the requirements,

12  of my research program at Florida State is that we publish

13  our results, that we generate new data, move science forward

14  and publish that data.  In my independent career, I have

15  published a little over 60 peer-reviewed publications in

16  addition to a number of book chapters.  During my Ph.D. and

17  post-doctoral training, there was maybe another nine or ten

18  papers during that time as well.

19  Q     About how many would you estimate that you've worked on

20  or had published, how many journals?

21  A     In total, it's maybe a shade over 70.

22  Q     And they deal specifically with the area of organic

23  chemistry?

24  A     Specifically with the area of organic chemistry broadly

25  defined.  Particular papers might be very fundamental core

1  principles of physical organic chemistry.  Others might have

2  more of a biological slant to them.  It just depends on the

3  particular project.

4  Q    What about in the area of pharmacology?

5  A    There's one paper that I would classify as covering

6  pharmacology -- the specific pharmacology of the substances

7  that we prepared, and that was a paper from earlier this

8  year.

9  Q    Do you hold any patents?

10  A    I hold multiple patents.  It's on the order of five or

11  so.  They're related to two different commercial products

12  that are used to control, manipulate, functional groups for

13  purposes of organic synthesis in medicinal chemistry; and

14  so, these products are on the market for sale, and they're

15  typically purchased by university synthesis labs and

16  pharmaceutical company medicinal programs.

17  Q    Do you also provide expert peer-review services for

18  other leading journals and funding agencies?

19  A    Yes.  I'm frequently called upon to provide input, peer

20  review, for manuscripts that have been submitted for

21  publication and also grant applications that have been

22  submitted for funding.  The journals include chemistry and

23  also some medicinal chemistry journals:  For example, the

24  *Journal of the American Medical Society*, *Journal of Organic*

25  *Chemistry, Bioorganic and Medicinal Chemistry Letters,* and

1    the American Chemical Society *Medicinal Chemistry Journal.*

2    Q     Does any of that also involve pharmacology?

3    A     Yes, particularly the *Medicinal Chemistry Journal* will

4    typically include organic synthesis and pharmacological

5    evaluation of the structures.  There's a feedback cycle in

6    those particular -- in medicinal chemistry in general.

7    Q     And does medicinal chemistry relate to pharmacology,

8    and can you tell us how it relates to it, if it does?

9    A     So, medicinal chemistry would be the broader umbrella

10   that encompasses the chemical synthesis, so the preparation

11   of a design and the preparation of particular small molecule

12   substances that might be anticipated to have a

13   pharmacological effect, followed by the evaluation of those

14   pharmacological effects, and then upon analysis of that

15   data, communicate back to design a new substance that would

16   then be prepared.  So, it's a feedback cycle of preparing

17   and testing small organic molecules in the hopes of

18   eventually moving forward with a drug candidate.

19   Q     Now, can you explain to us exactly what is an expert

20   peer service review?

21   A     So, when a manuscript is submitted to a journal for

22   publication, the peer-reviewed journals will evaluate that

23   manuscript for its appropriateness for their journal, for

24   its contents, but then they will also send it out to a

25   number of respected members of the community for those

1  people to evaluate the manuscript for completeness, for its

2  likely impact on science, and ultimately for the

3  appropriateness of whether or not the journal should publish

4  that particular manuscript.

5  Q    Can you summarize any awards or professional

6  recognition that you received over the course of your

7  career?

8  A    Yes.  I've received from -- within FSU, the FSU

9  Innovator Award, the FSU Developing Scholar Award, FSU

10 Teaching Award.  I received also an innovator award from the

11 research corporation, a new investigator award from the

12 Florida Department of Health.  I was featured in a *Florida*

13 *Trend* magazine, highlighted as a person to watch in

14 connection to biotech growth in Florida, and I was recently

15 designated as a -- as the Raymond Cattell family professor

16 of -- of chemistry and biochemistry at FSU in recognition to

17 dedication to excellence in classroom and laboratory

18 teaching in chemistry and biochemistry, among others.

19 Q    What work have you done for pharmaceutical companies or

20 biotech companies?

21 A    I consult regularly with pharmaceutical and biotech

22 companies, in particular, the medicinal chemistry programs

23 within those -- within those companies.  I've done this over

24 the years for a number of different pharmaceutical

25 companies.

1    In the last year, I've gone on consulting trips to a

2 startup biotech called "Ensemble Therapeutics" in Cambridge

3 just off of the MIT campus.  One of my former students is

4 the director of medicinal chemistry at that biotech.

5    I also visited and consulted at Cubist Pharmaceuticals,

6 which at the time I would have classified as a large

7 biotech.  They were recently purchased by Merck.  And then

8 also I made a consulting visit to Rigel Pharmaceuticals,

9 which is a small pharmaceutical company in the Bay Area.

10 Q    How much of this work relates to the specific area of

11 pharmacology?

12 A    Those consulting visits are in the area of medicinal

13 chemistry; and so, the visit and the consulting trip and the

14 discussions center around the interplay between chemical

15 synthesis and pharmacology.  Most typically I will visit the

16 company and give a presentation on my academic research,

17 which is a way for them to keep abreast of what's going on

18 in the academic research areas and what topics people are

19 interested in, and then I will spend the day on one-on-one

20 or in subgroup meetings talking with their medicinal

21 chemists about whatever problems they're struggling with at

22 the moment.

23 Q    Were these considered major or minor projects you

24 worked on with these companies?

25 A    Well, I wouldn't say that -- I wouldn't say that we

```
 1  collaborated on these projects, although we do separately
 2  have some collaborations that we are setting up.  These are
 3  more consulting visits where they are telling me about the
 4  different projects that they are working on, and I will
 5  bounce ideas off of them of different structures that they
 6  might consider as far as optimizing the pharmacological
 7  effects that they are interested in and then also,
 8  importantly, how they might consider preparing those
 9  substances.
10  Q    And have you ever testified in the courts of law in the
11  United States in the area of chemistry and pharmacology?
12  A    Yes.
13  Q    Okay, and specifically with federal courts, how many
14  have you testified in?
15  A    I testified in federal court a number of times as it
16  pertains to chemistry and pharmacology.  This would be my
17  fourth.
18  Q    And, specifically, here in the Middle District of
19  Florida you've testified on several different occasions?
20  A    Yes.  This would be my third time in testifying on
21  chemistry and pharmacology here in the Middle District.
22  Q    And previously you have been qualified as an expert in
23  both areas, chemistry and pharmacology?
24  A    Yes.
25  Q    Now, being qualified as an expert in pharmacology, even
```

```
 1  though you weren't specifically trained in that area, you do
 2  you have, as stated, specific training in pharmacology?
 3  A    I'm sorry?
 4  Q    You do have some specific training and knowledge in the
 5  area of pharmacology?
 6  A    Yes, I have expertise in pharmacology that relates back
 7  to my training in the molecular pharmacology and chemistry
 8  program at Sloan Kettering and then also the ongoing work
 9  that I've been doing in consulting with pharmaceutical
10  companies, reviewing for medicinal chemistry journals, et
11  cetera, and also for the funding agencies.
12  Q    Thank you.
13         MR. ANDERSON:  Your Honor, at this time I'd ask
14  that Dr. Gregory Dudley be recognized as an expert in both
15  the fields of chemistry and pharmacology.
16         THE COURT:  Ms. Peluso?
17         MS. PELUSO:  May I ask him a few questions?
18         THE COURT:  You may.
19                 VOIR DIRE EXAMINATION
20  BY MS. PELUSO:
21  Q    Good morning.
22  A    Good morning.
23  Q    Do you go by "Professor" or "Doctor"?
24  A    Either one.
25  Q    Either one, okay.
```

```
 1        Professor Dudley, you have a Ph.D. in organic
 2   chemistry?
 3   A     Yes.
 4   Q     And you've continued your education obviously in order
 5   to support your knowledge in that field?
 6   A     (Nods head.)  Yes.
 7   Q     And let's see.  And, in fact, in order to continue to
 8   be an expert in the area of organic chemistry, you take
 9   continuing education just as we would as lawyers; we have to
10   take continuing legal education to continue to have
11   expertise in certain areas of the law?
12   A     So, there's not a formal continuing education program.
13   As I mentioned, I read the literature regularly, review the
14   literature and grant applications, go to conferences, bring
15   in speakers from other universities, go to other
16   universities to engage and interact with other scientists
17   from different areas, but there's not a formal ongoing
18   training.
19   Q     Okay.  Well, then let's go back to the Ph.D. that you
20   received.  It's my understanding that in order to obtain a
21   Ph.D. in organic chemistry you have to go through a number
22   of rigorous examinations in order to get that Ph.D.;
23   correct?
24   A     Yes.
25   Q     And that would all be in that area of organic
```

1    chemistry?

2    A    So, in my case, it wasn't actually, but one could work

3    through the Ph.D. program.  At least the Ph.D. program at

4    MIT, one could pass courses only in organic chemistry and,

5    more specifically to your question, pass the rigorous

6    cumulative exams only in organic chemistry; but that's not a

7    requirement.  One can pass exams in other areas.  It's not

8    typical; but if one is interested in passing those exams

9    more quickly, one can do that so by taking exams in other

10   areas; and in my case, I passed three exams in organic

11   chemistry:  One in biochemistry, one in physical chemistry,

12   and one in organic chemistry.

13   Q    And all of that was in order to obtain your -- your

14   Ph.D.?

15   A    That was to -- to pass my candidacy and my qualifying

16   exams to proceed in the Ph.D. program, yes.

17   Q    Okay.  And in order to -- would you agree then that to

18   obtain a Ph.D. in the area of pharmacology, like

19   Dr. Prioleau did, that one would or could have to pass a

20   number of very rigorous exams in order to be qualified or --

21   as a pharmacologist?

22   A    There's a lot of latitude, flexibility, in terms of the

23   different Ph.D. programs.  All the different Ph.D. programs

24   have their own structure and requirements.  I don't know

25   what particular exams she might have had to pass.

```
 1   Q    But you would agree that, like chemistry, she would
 2   likely have to pass numerous rigorous exams?
 3   A    Again, different Ph.D. programs have different
 4   requirements.  Many do have qualifying exams of one type or
 5   another, and I would expect that there would be a lot of
 6   parallel between medici-- I'm sorry, the organic chemistry
 7   Ph.D. programs and the pharmacology Ph.D. programs in terms
 8   of their structure.
 9   Q    Okay, but you -- but you're only speculating, because
10   you haven't actually gone through a program that would
11   ultimately get you a Ph.D. in pharmacology?
12   A    I'm only speculating because you asked me to.
13   Q    Okay.  In fact, you haven't had any of those --
14   personally, you haven't taken any of those exams that
15   somebody would normally have to take to be a pharmacologist?
16   A    I have visited pharmacology departments, given
17   seminars, interacted with those faculty, and my students
18   have gone on to medicinal chemistry programs.
19   Q    Okay.  But in the -- in those conferences and programs
20   that you talked about earlier that you've presented in or
21   reviewed, you never actually represented yourself as a,
22   quote, unquote, pharmacologist, did you?
23   A    No.
24   Q    And, in fact, the papers -- I think you said that you
25   had 60 or in excess of 70 published papers that you either
```

1  were a author or co-author in?

2  A    Yes, all co-authors.  I have multiple authors on all of

3  my publications, in particular, the graduate students and

4  post-docs that are in the lab that I'm supervising on the

5  more recent ones.

6  Q    And in the one area, you said only one out of those 70

7  actually was published that included the area of

8  pharmacology?

9  A    There was only one of those papers, yes.

10  Q    Okay; and in that paper, you actually co-authored it

11  with other individuals?

12  A    Yes.  It was a collaboration with someone at the FSU

13  College of Medicine.

14  Q    Okay, and that person was a pharmacologist?

15  A    To the extent that it was pharmacology data broadly

16  defined, yes, that person would have been a pharmacologist.

17  Q    Okay.  And just to be clear -- in fact, I think you

18  testified under oath in other cases that you are not a,

19  quote, unquote, pharmacologist?

20  A    That's correct.  I am a professor of chemistry and

21  biochemistry.

22        MS. PELUSO:  Your Honor, that's the extent of my

23  questions, but I do want to make an argument.

24        THE COURT:  All right, you may.

25        MS. PELUSO:  We would object to him being

1  qualified as an expert in pharmacology for the reasons

2  stated:  That he's not a pharmacologist.  He's never taken

3  the rigorous exams to become a pharmacologist or get a Ph.D.

4  in pharmacology; and, indeed, the only one published paper

5  that had to do with pharmacology was co-authored with a

6  pharmacologist.  And so, we would suggest that he certainly

7  is well qualified to be qualified as an expert in chemistry

8  and organic chemistry, but certainly not in the sense of

9  being a pharmacologist.

10          THE COURT:  Mr. Anderson?

11          MR. ANDERSON:  Judge, I would argue that, as

12  Dr. Dudley has stated, he's had significant work-related

13  experiences in the area of pharmacology; that the studies of

14  organic chemistry and pharmacology are almost interrelated

15  or very much interrelated; that his studies -- that he's

16  given expert help to companies, other areas, and that, quite

17  frankly, Judge, I believe he's been noticed as an expert at

18  least on two different occasions before judges in this

19  district.

20          Judge, I believe it was Judge Covington who had

21  held him as an expert back in January, and I believe last

22  week Judge Chappell down in Fort Myers held that his

23  testimony could be viewed as an expert in areas of both

24  chemistry and pharmacology.

25          I believe there's significant work here that shows

1  that he can give an opinion on it, and I would ask this

2  honorable court to allow him to do so at this time.

3         THE COURT:  All right, I'm going to sustain the

4  objection with regard to the pharmacology.  I will qualify

5  him as an expert with regard to chemistry and, in

6  particular, organic chemistry, but I haven't heard anything

7  that would make me accept his opinion as an expert

8  specifically limited to pharmacology.

9         You may proceed.

10              *CONTINUATION OF DIRECT EXAMINATION*

11 BY MR. ANDERSON:

12 Q    Dr. Dudley, do you understand that this case

13 involves -- I'm sure you do -- the issue of the substance

14 ethylone?

15 A    Yes.

16 Q    Okay, and in being asked to deal with ethylone in this

17 case, what approach and methodology did you take in

18 reference to the study of ethylone in this case?

19 A    Well, I was asked to look at the substance ethylone,

20 look through the sentencing guidelines based on the criteria

21 as outlined in the sentencing guidelines, and identify what

22 substances would be relevant for the present considerations.

23 For that, I did have to consider the chemistry and the

24 pharmacology.

25 Q    Okay.  Have you been able to review the data and come

1  to an opinion in the case on, I believe there's -- there

2  should be three factors.  First of all, what are the three

3  factors that you would make a determination to concerning

4  ethylone?

5  A    The three factors that I looked at were the three

6  listed in the guidelines, and those are, broadly speaking --

7  (a) relates to chemical structure; (b) relates to

8  pharmacological effects; and (c) relates to the potency of

9  the substances.

10  Q    Okay.  And in preparation of your testimony today, did

11  you prepare similar to, I guess, the government's witnesses,

12  a chart of any form in reference to the substances that are

13  in question today, particularly ethylone-related substances?

14  A    Yes.  I prepared a number of visual aids.

15  Q    Okay.

16         MR. ANDERSON:  Your Honor, if I may approach the

17  lectern.

18  BY MR. ANDERSON:

19  Q    Dr. Dudley, this is what's been previously marked as

20  Defendant's -- Defense Exhibit A1.  Is that part of the

21  chart that you submitted for review (changing overhead

22  exhibit)?

23  A    Yes.

24  Q    All right, and can you tell the court and the folks

25  here in this courtroom what specifically is on this chart?

 1  A    This chart gives the two-dimensional representations of

 2  the structures of ethylone and MDEA.  For the most part, the

 3  structures are coded the way it -- by convention in organic

 4  chemistry where the vertices lines indicate bonds of shared

 5  electrons.  Vertices and terminal positions that are

 6  unlabeled would represent carbon atoms, and many of the

 7  specific hydrogen atoms are not explicitly drawn but,

 8  rather, are implied.  On the other hand, I did include

 9  particular carbon and hydrogen atoms for illustrative

10  purposes.

11  Q    Okay.  And, specifically, this is ethylone and MDEA;

12  correct?

13  A    Yes, on the left is the two-dimensional representation

14  of the structure of ethylone, and on the right is MDEA.

15  Q    All right.  And, specifically, based upon your chemical

16  study of this, the specific difference between ethylone and

17  MDEA is what?

18  A    Ethylone is a ketone.  MDEA has -- at that ketone

19  position of ethylone, it has a methylene group.  So, MDEA is

20  not a ketone.

21  Q    Okay.  Would you classify that as a specific or

22  significant difference in the two?

23  A    I do consider the difference between the ketone and not

24  ketone to be significant in terms of classifying the

25  structures and in considering what their -- their chemical

1  properties are going to be.

2  Q    I'd like to call your attention to what's previously

3  been marked as (changing overhead exhibit) Defendant's

4  Exhibit 2 -- A2, and this is the -- do you recognize this,

5  Dr. Dudley?

6  A    Yes.

7  Q    And can you tell us here in the courtroom what that

8  specifically is?

9  A    This particular graphic illustrates the core structures

10 of cathinone and amphetamine, as well as the dietary

11 essential amino acid phenylalanine for comparative purposes.

12 Amphetamine is illustrated in the middle, Cathinone on the

13 left, and phenylalanine on the right.  At the top are the

14 two-dimensional representations of the structures.  Along

15 the bottom are computer-generated images that are designed

16 to capture better the three-dimensional structure of these

17 three substances.

18 Q    All right.  Now, the drug ethylone would fall under

19 what category, Dr. Dudley?

20 A    Ethylone would fall under the cathinone category.

21 Q    And what would MDEA fall under?

22 A    MDEA is an amphetamine.

23 Q    All right.  And so that basically they are -- in that

24 retrospect, they are significantly different?

25 A    They are -- they would be, and they typically are in

```
 1  the literature categorized differently, with ethylone being
 2  described and discussed amongst the cathinones and DEA
 3  described and discussed amongst the amphetamines.
 4  Q    Doctor, I am now showing you what's previously been
 5  marked (changing overhead exhibit) as Defendant's Exhibit
 6  A4.  Do you recognize that, doctor?
 7  A    Yes.
 8  Q    And what is that, and do you have any role in preparing
 9  what we're seeing now?
10  A    Yes.  I prepared this chart, this graphic as well.  It
11  shows in the top center the two-dimensional representation
12  of the structure of methylone.  It then along the bottom
13  illustrates the structures of ethylone and butylone and how
14  they relate to the structure of methylone.  In particular, I
15  have circled the extra carbon of ethylone and the extra
16  carbon of butylone, showing that the extra carbons of the
17  two respective structures are attached at different points
18  on the structure of methylone, and that's consistent with
19  their designation with ethylone being a positional isomer of
20  butylone.
21  Q    Would you, in your opinion, state that methylone and
22  ethylone are somewhat or substantially similar types of
23  drugs or have substantially similar types of compound
24  makeups?
25  A    So, the term or the language "substantially similar" is
```

1  found in law; and within the context of court decisions,

2  et cetera, yes, I would consider ethylone to be

3  substantially similar in its chemical structure to methylone

4  and to butylone.

5  Q    Would you consider it more or substantially similar to

6  those two drugs than the drug MDEA?

7  A    Yes.

8  Q    Even though you heard testimony here this morning that

9  the difference is this beta caratone or the --

10  A    The beta ketone.

11  Q    The beta ketone?

12  A    Yes.  The beta ketone has a defining impact on the

13  chemistry of the cathinones.

14  Q    Doctor, I am showing you what's previously been marked

15  as Defendant's Exhibit A6 (changing overhead exhibit).  Do

16  you recognize that?

17  A    Yes, I do.

18  Q    And what is that, Doctor?  Can you tell us here in the

19  courtroom specifically what it is, and have you had any

20  participation in the structure or this?

21  A    So, I prepared this table as well.  This table lists on

22  the left six different substances -- in particular, MDEA,

23  methylone, and ethylone, and then butylone -- which are

24  relevant to this particular -- to this particular hearing;

25  and then across the table I've collected and compiled data

1   on the pharmacological effects and potency of these

2   substances.

3           MS. PELUSO:  Your Honor, may we approach?

4           THE COURT:  Yes.

5           *(Bench conference as follows:)*

6           MS. PELUSO:  Your Honor, as you have ruled before,

7   he's not qualified as an expert in the field of

8   pharmacology, and it looks to me like this entire slide is

9   based on his analysis of pharmacological data in comparing

10  all these different substances.

11          THE COURT:  Okay, let me get this.

12          MS. PELUSO:  It appears to me like he's going into

13  the area of analyzing in vitro studies, which is done in

14  pharmacology, in order to make whatever assumption or

15  whatever conclusion he's going to make.  I don't see in this

16  particular slide that he's going to be testifying as an

17  organic chemist versus what he's not qualified to do as

18  testifying as a pharmacologist.

19          THE COURT:  Okay, response?

20          MR. ANDERSON:  Judge, what I believe he's going to

21  testify to is the chemical difference in the drugs.  I can

22  have him clarify that.

23          THE COURT:  That's fine.  Sure, I'll allow that.

24  I think he's imminently qualified as a chemist.

25          MS. PELUSO:  Sure, but I was concerned about the

```
 1   pharmacology data that he was referring to above.
 2              THE COURT:  Okay.
 3              MR. ANDERSON:  We'll clear it up, Judge.
 4              THE COURT:  Okay, thank you.
 5              (Bench conference concluded.)
 6   BY MR. ANDERSON:
 7   Q    Dr. Dudley, in Exhibit A6, is any of this information
 8   based upon your experience in the field of organic chemistry
 9   or was any organic chemical data used or your experience as
10   an organic chemist used to draw any conclusion of data
11   you're seeing in A6?
12   A    Yes.  This is the --
13              THE COURT:  Let me just stop for you a minute,
14   Dr. Dudley.
15              Mr. Anderson, direct the microphone down.  There's
16   one there, too.  You just have to raise it to your mouth.
17              Okay, you may answer now, Dr. Dudley.
18              THE WITNESS:  Yes.  This is the type of data that
19   I review for grant applications and for publication in
20   medicinal chemistry journals.
21   BY MR. ANDERSON:
22   Q    Okay.  So, even though it states "pharmacology," what
23   aspect of this information would you be reviewing and
24   sending it on to other periodicals and things of that
25   nature?  Would it be from a chemical aspect or chemistry
```

1  aspect?

2  A    Yes.  This data reflects the molecular interactions

3  between small organic molecule drugs and larger

4  biomolecules, which are also organic structures; and so, the

5  interactions are based on organic chemistry, organic

6  chemical interactions, between smaller molecules and larger

7  molecules in the body.

8  Q    All right.  And, specifically, what are the six drugs

9  that we see here on this chart?

10  A    The six drugs that I have listed, the drug substances

11  on the left-hand column are methamphetamine; methcathinone;

12  MDEA, which is methylenedioxy; methylone, which is

13  methylenedioxymethcathinone; ethylone, which is

14  methylenedioxyethcathinone; and butylone.

15  Q    And chemically can you make a determination as to the

16  potency of these drugs or give an opinion as to the potency

17  of these specific drugs?

18  A    These data in this particular table give the -- the

19  values or the -- the ability of these various drug

20  substances to engage with particular transporters and either

21  plug up the transporter to prevent movement of another

22  organic molecule through the transporter or stimulate the

23  release of that neuro-- or another small organic molecule

24  through that transporter across the cell membrane.

25  Q    Specifically now, there's nothing here related to

1  ethylone.  So, basically we see six boxes of N/A, not

2  applicable and not applicable.

3  A    This particular study looked at a number of different

4  drug substances and their interactions in human cells, but

5  ethylone was not included in this particular study.

6  Q    Why was that?

7  A    There were many other substances that weren't included

8  in this particular study.  Ethylone just -- it wasn't one of

9  the ones they chose.

10 Q    All right.  Methamphetamine -- basically looking at the

11 line concerning methamphetamine and as it compares to

12 methylone and MDMA, based upon this chart, would you be able

13 to give an opinion as a chemist as to, of those drugs, which

14 would be basically the most potent type of drug?

15 A    These numbers give an indication effectively of how

16 well the drug substance binds to the transporter molecule or

17 protein, and the lower number reflects a stronger

18 interaction.  So, the lower the number reflects a tighter

19 binding interaction or more potent substance.

20 Q    All right, specifically looking at MDMA and methylone,

21 would there be instances where MDMA is more of a potent drug

22 than methylone, or would there ever been instances based on

23 this chart where methylone is more potent?

24 A    There are a number of different ways to measure the

25 relative interactions between MDMA and methylone and the

1  transporters; and, in particular, there are six key types of

2  experiments where one can measure the chemical interactions.

3  I've presented the data from all six of these -- all six of

4  these experiments; and in each case, there's a different

5  relative potency between methylone and MDMA.

6  Q    Overall, based upon your studies, could you give an

7  opinion as to whether or not methylone and -- is more of a

8  potent drug than MDMA, or is MDEA more potent than

9  methylone?

10  A    Well, from looking at these data, you can look at the

11  six different ways that one could measure those potencies in

12  human cells, and one could then come to an overall

13  determination at one's discretion.

14      So, for example, MDMA is more potent in the first

15  category, the second category, the third category, the

16  fourth category, and the fifth category.  Methylone is a

17  more potent lower number in the sixth category.

18  Q    All right, and the lower the number is, that means the

19  higher the potency is?

20  A    Correct.  So, across these six different data points,

21  these data would give you overall an indication of the

22  profile of effects, and then the absolute numbers give you

23  the potency of the interactions.

24  Q    Okay.

25      I'd like to draw your attention to what's previously

1  been marked as Defendant's Exhibit A8.  In your preparation

2  for your testimony here today, did you have any preparation

3  of this chart or preparing this chart that's before the

4  court now?

5  A    Yes, I prepared this chart.

6  Q    All right, what specifically is this chart in reference

7  to that you prepared today?

8  A    Well, because ethylone was not included in the previous

9  study, I looked for another study where ethylone and

10  methylone were included so that one could compare those two

11  substances and their interactions directly; and in this

12  particular study, ethylone and methylone were evaluated side

13  by side in terms of their ability to block the various

14  transporter protein molecules.

15  Q    And you did this study based upon looking at the

16  chemical makeup of these drugs?  Is that what you did?

17  A    I looked at the data, and the data reflects the

18  molecular interactions between the small organic molecule

19  drug substances and the biomolecules, the protein

20  transporters in the cells.

21  Q    And in looking at this chart, would one be able to make

22  a determination, is ethylone as potent a drug chemically as

23  methylone?

24  A    These -- these are three different experiments by which

25  one can compare ethylone and methylone; and on the left,

```
 1  I've shown the raw data.  On the right-hand side, I've
 2  reproduced that same data but normalized to the least potent
 3  interaction.  So, across the different types of biomolecular
 4  transporters, methylone is more potent in the first category
 5  and the third category, and ethylone is more potent in the
 6  second category.
 7  Q    But in your opinion as far as the drug compound or
 8  makeup chemically, ethylone and methylone are similar?
 9  A    One can look at this data and draw one's own subjective
10  conclusions or opinions regarding the likely potency, but I
11  think a reasonable one would be that they're broadly
12  similar.
13  Q    And, Doctor, one last chart I'd like to have you to
14  look at.  This has previously been marked as Defense Exhibit
15  A3 (changing overhead exhibit); and in your preparation for
16  coming here today, did you prepare this chart, and can you
17  explain specifically what it is?
18  A    I did prepare this chart.  This chart shows why
19  butylone and ethylone are positional isomers.  It's not just
20  a matter of having the same atoms in a different
21  composition.  The legal definition of a positional isomer is
22  very explicit about functional groups and that functional
23  groups cannot be altered, created, or destroyed in the
24  process, so that the legal definition of "positional isomer"
25  requires a functional group to be maintained.
```

1    So, in the top row, butylone and ethylone are

2 positional isomers based on the transposition of the

3 hydrogen and methyl groups that are circled.  On the bottom

4 row, amphetamine and dibenzylamine, we have a nitrogen and a

5 carbon that have been transposed in these two substances;

6 but in this case dimethylbenzylamine would not qualify as a

7 positional isomer because a functional group has been

8 altered, and that is significant.

9 Q    Significant how, Doctor?

10 A    Significant in terms of the legal definition of

11 "positional isomer"; that if a functional group has been

12 alter, added, or deleted, it no longer qualifies.  And that,

13 in my opinion, is likely because the alteration of the

14 functional group is likely to alter the chemical properties

15 in a significant way; and, indeed, in this case,

16 dimethylbenzylamine is used in the materials industry but is

17 not known to have any potential abuse -- potential for

18 abuse.

19         MR. ANDERSON:  Your Honor, at this time I'd ask

20 that Defendant's Exhibits A1, 2, 3, 4, 6, 7, and 8 be

21 admitted at this time in evidence for the court's review.

22         THE COURT:  Is there any objection?

23         MS. PELUSO:  Your Honor, for the reasons stated at

24 sidebar, I object to 6 and as well related 8, because he's

25 not qualified to give opinions based on pharmacology

1  studies, as well as 7 -- I don't know if he named 7.  But

2  this last one where he is talking about positional isomers,

3  I don't know how that -- I think that's Number 3.  I also

4  object to that because I don't know how there's any possible

5  relevancy to any determination that this court has to make.

6  I think it's been well established that ethylone is a

7  positional isomer of the controlled substance butylone, but

8  how the relevance of comparing amphetamines and -- well, the

9  other one, there just doesn't appear to be any relevance in

10 this case and this court's determination.

11         THE COURT:  All right, response?

12         MR. ANDERSON:  Judge, I would contend that 6, 7,

13 and 8 he's giving an opinion from a chemical perspective as

14 to the chemical makeup of these drugs and he's not relating

15 to them from a pharmaco-- pharmacist perspective.  He's not

16 giving a pharmacological viewpoint of it.  He's stating or

17 giving an opinion as to them from the chemical makeup and

18 chemical compound and how they would affect someone as far

19 as chemically.  He's not giving an opinion as far as -- what

20 it would be as far as a pharmacologist.

21         With the third one, Your Honor, "legally defined

22 as positional isomers," again --

23         THE COURT:  Which one?  Let's be clear for the

24 record.

25         MR. ANDERSON:  That's A3, Judge, "legally defined

1  positional isomers," I would contend here again, Judge, he's

2  giving an opinion or showing that there is a difference

3  between -- I guess those are the overall totality of the

4  circumstances here that lead the court -- that you could

5  make a difference between or show a significant difference

6  here, because the government is basically trying to say the

7  difference is not that great between MDEA and ethylone and

8  basically showing here that the beta ketone, which is

9  different, is a significance difference.  And, again, this

10  chart goes to show the degree -- or helps to show the degree

11  of difference between all of these different types of drugs

12  so that this honorable court could use it in making its

13  determination as to whether or not there is again -- should

14  be given greater weight to the difference between MDEA and

15  ethylone.

16          THE COURT:  Is that what Chart Number 3 shows?

17          MR. ANDERSON:  It shows a difference between

18  ethylone's positional isomer group butylone and then the

19  difference between amphetamine, which is what MDEA is, and

20  it's been the testimony that it is an amphetamine, where

21  ethylone is a cathinone or can be also be viewed as a

22  positional isomer.  So, there is a difference.

23          And all I'm saying, Judge, is it's an aid to

24  assist the court in showing that the difference is a lot

25  greater than the government witnesses are here trying to

```
 1  present to the court today.

 2          THE COURT:  Okay, I'm going to overrule the

 3  objection and admit Defendant's Exhibits 1 -- 2 I don't

 4  think has the number on it, but that -- is this 2, cathinone

 5  and amphetamines?

 6          MR. ANDERSON:  Yes.  I'm sorry, the print must not

 7  have come out on that.  That's 2.

 8          THE COURT:  3, 4, 6, 7, and 8.  And although 6 and

 9  7 and 8 -- well, 6 and 7, in particular, refer to

10  pharmacology data, and then 8 was adapted from

11  Pharmacological Characterization of Designer Cathinones

12  in Vitro.  The witness has clearly testified with regard to

13  these aids as a chemist and not from a pharmacological

14  statement; and so, the court will receive them.  They are

15  admitted.

16          (Defendant's Exhibits A1, 2, 3, 4, 6, 7, and 8

17  were received in evidence.)

18          THE COURT:  You may continue.

19          MR. ANDERSON:  Thank you.

20  BY MR. ANDERSON:

21  Q    Doctor, let's talk somewhat about potency now.  Did you

22  ever compare ethylone to methylone and then methylone to

23  ethylone?

24  A    Yes.

25  Q    Okay, and did you ever compare ethylone in your studies
```

1  to MDEA?

2  A    No, not directly.  There weren't studies that would

3  allow one to make that direct comparison between ethylone

4  and MDEA.

5  Q    What data did you focus on when making your comparison

6  to ethylone and methylone?

7  A    Ethylone and methylone, I looked at their relative

8  binding abilities and the -- and the potency of their

9  interactions with the transporters in the similar studies

10 side by side.  That was methylone and ethylone.

11 Q    All right, and did you do any studies with methylone to

12 MDMA?

13 A    Yes.  In the first table that you put up, the Eschelman

14 study, that showed that interactions between MDMA and the

15 various transporter biomolecules and methylone and the

16 various transporter molecules.

17       MR. ANDERSON:  Your Honor, if I could have a

18 moment with Mr. Scriven.

19       THE COURT:  Yes.

20       (Pause while Mr. Anderson confers with

21 Mr. Scriven.)

22       MR. ANDERSON:  Judge, at this point I have no

23 further questions.

24       I don't know if you're going to allow the

25 co-counsel first or Miss Peluso to cross-examine.

```
 1              THE COURT:  I'm going to allow co-counsel first.
 2              MR. ANDERSON:  Judge, at this time I have no
 3    further questions of Dr. Dudley, and I will at this time
 4    tender the witness.
 5              THE COURT:  Okay, thank you.
 6              MR. FUTERMAN:  Your Honor, I have no questions.
 7              MR. ANGELIS:  I have no questions, Your Honor.
 8              MR. SCRIVEN:  Your Honor, I just have a few
 9    questions.
10              THE COURT:  Mr. Scriven.
11                        CROSS-EXAMINATION
12    BY MR. SCRIVEN:
13    Q    Good morning again, Dr. Dudley.
14         Dr. Dudley, you've heard us talking this morning about
15    structural -- I'm sorry, substantial similarity; correct?
16    A    Yes.
17    Q    Okay.  In your opinion, what would ethylone be
18    substantially similar to in terms of the listed chemicals in
19    the guidelines?
20    A    None of them.
21    Q    None of them?
22    A    In terms of substantially similar, none of them in
23    chemical structure.
24    Q    Okay.  Why would ethylone not be considered
25    substantially similar to MDEA?
```

```
 1   A     Most simply, ethylone is a ketone, and MDEA is not.
 2   There are certainly other structural features that appear
 3   similar, but that -- the central ketone has a profound
 4   impact throughout the molecule in terms of the electronics
 5   of the aromatic ring on its left, in terms of the acidity of
 6   hydrogen on the carbon to its right.
 7         In terms of the overall molecular shape, ketones are
 8   trigonal planar, so flat.  The methylene of MDMA or MDEA
 9   is -- has a tetrahedral shape; and so, the substituents on
10   either side of that carbon are projected in different
11   orientations for the two substances.  So, it -- yes, it
12   is -- it is a -- it can be described simply as a -- as the
13   addition of an extra oxygen, but that is an important
14   structural feature of the molecule.
15   Q     Okay.  So, if I can just kind of try and simplify what
16   you said in laymen's terms, the presence of that one oxygen
17   molecule affects basically the whole thing?
18   A     Yes, the effect of the --
19             THE COURT:  In laymen's terms.
20             THE WITNESS:  In laymen's terms, yeah.  The
21   further away you go from the ketone, the less the impact is
22   felt; but yes, the impact of that ketone, it does have an
23   impact throughout the structure.
24   BY MR. SCRIVEN:
25   Q     Okay.  Are you aware of any other examples in the
```

```
 1   guidelines that differentiate between essentially an
 2   amphetamine and a cathinone?
 3   A    Yes.
 4   Q    Could you tell us what those are?
 5   A    So, there are two substances in the guidelines,
 6   methcathinone and methamphetamine, that are otherwise the
 7   same substance except for that ketone chain.  So, the
 8   difference between methamphetamine and methcathinone is
 9   analogous to the difference between MDEA and ethylone.
10   Q    Okay, and what would -- and you've obviously reviewed
11   the sentencing guidelines?
12   A    Yes.
13   Q    Okay, and what is the equivalency ratio for
14   methamphetamine?
15   A    For pure methamphetamine, the substance, it's
16   20,000 grams to one gram.
17   Q    Of marijuana?
18   A    Yes.  Or 20,000 grams of marijuana for one gram of
19   methamphetamine, yes.
20   Q    Okay.  And what's the equivalency ratio for
21   methcathinone?
22   A    I believe it is 350 to 1.  So, 350 grams of marijuana
23   for 1 gram of methcathinone.
24   Q    Okay.  So, in just summarizing that particular
25   statement -- so, the difference between methamphetamine and
```

```
 1  methcathinone is the addition of that one ketone?

 2  A    That is the -- right.  Methcathinone is a cathinone

 3  that has that ketone functional group.  Methamphetamine is

 4  an amphetamine.  It does not have that ketone functional

 5  group.

 6  Q    Otherwise, structurally they're similar?

 7  A    Otherwise, yes.

 8  Q    Okay, and the difference is the 20,000-to-1 ratio

 9  versus the 350/1 ratio?

10  A    Yes, sir.

11          THE COURT:  Excuse me one second.

12          All right, you may continue.

13          MR. SCRIVEN:  Thank you.

14  BY MR. SCRIVEN:

15  Q    When -- when attempting to, I guess, determine the

16  effect of a particular substance, you've heard from the

17  government's experts the discussion about a structural

18  activity relationship?

19  A    Yes.

20  Q    Okay, could you explain what that is?

21  A    The structure activity relationship relies on the --

22  again, the interplay between chemical synthesis, chemical

23  structure, and pharmacology.  So, it's based on the

24  principle that similar structures should have similar

25  properties.  This is a very simple idea to express.  It's an
```

```
 1  impossible one to define because we don't have a good handle

 2  on -- what we perceive to be similar in chemical structure

 3  may not necessarily reflect the eventual outcomes in living

 4  systems.

 5  Q    So, when you make those predictions, what are some of

 6  the things that you would look to?  For example, I believe

 7  the government's witness testified that you could predict a

 8  stimulant effect based on the -- based on the addition of

 9  a -- is it the methyl group on the phenethylamine core; is

10  that right?

11  A    For example, yes.

12  Q    Got you.  Now, are there other substances to your

13  knowledge that would have -- that would have that methyl

14  group on the phenethylamine core that would not be

15  considered scheduled controlled substances, if that makes

16  sense?

17  A    Yes, I would you think so, yeah, that there could be --

18  just having that -- I assume you're referring to the alpha

19  methyl group --

20  Q    Yes.

21  A    -- that would define a phenethylamine further as an

22  alpha phenethylamine or amphetamine.  So, yes, there might

23  be other substances that would have that alpha

24  methylphenethylamine core structure that would not be

25  Schedule I controlled substances.
```

```
 1  Q    What essentially determines whether or not -- what
 2  would determine whether or not -- well, in considering the
 3  SAR, what determines whether the substances would be
 4  similar -- more similar than not?
 5  A    That's going to be the subjective judgment of the
 6  particular person who's doing the SAR analysis.  The
 7  structures are known.  The effects, the results, of previous
 8  experiments might be known, but how one would compile that
 9  data to make a prediction about a future hypothesis, about a
10  future experiment, there would certainly be some -- one
11  would be free to make whatever hypothesis they wanted to;
12  and oftentimes making distinct hypotheses could have value
13  in terms of directing future research experiments.
14  Q    Okay.
15       And just kind of going back to the very beginning, when
16  you -- I guess as you were studying ethylone, your approach
17  was to compare methylone to MDMA and then compare ethylone
18  to methylone; is that correct?
19  A    Yes.
20  Q    Okay, and why did you decide to do it that way?
21  A    Because there is data that allows one to compare
22  methylone to MDMA, whereas there is not data that allows one
23  to compare ethylone to MDEA directly.
24       So, effectively, the methylone and MDMA data is what --
25  is what underscores the SAR analysis.  So, if one were to
```

1  make a prediction of expected effects of methylone on MDEA,

2  one would look to the methylone and MDMA data, among other

3  things.

4  Q    Okay, the --

5          THE COURT:  I'm sorry, I have a question.

6          I understand, Dr. Dudley, now the reason you've

7  made the comparison with regard to the methylone and the

8  MDMA, because there is data, but the guidelines tell me to

9  look at, when I have a controlled substance that's not

10 listed in the guidelines -- to the -- one of the things I

11 can do is to try and find one that is substantially similar

12 to one that is listed.  And so, I don't understand -- and

13 maybe this is a question for the attorneys -- how I'm going

14 to compare ethylone to methylone when methylone isn't listed

15 either.

16         So, that's an additional jump.  I'm going from

17 ethylone to methylone and then from methylone to MDMA as

18 opposed to trying to find a substance here -- it says, "In

19 the case of a controlled substance that is not specifically

20 referenced in this guideline, determine the base offense

21 level using the marijuana equivalency of the most closely

22 related controlled substance referenced in the guidelines."

23         So, how can I compare ethylone to methylone when

24 methylone isn't listed either?  Don't I have to find

25 something in the guidelines that is comparable, and is it

1   your testimony that there's nothing in the guidelines that's

2   comparable to ethylone?

3            THE WITNESS:  No.  There are substances in the

4   guidelines that are comparable to ethylone.

5            THE COURT:  Well, that's what I need to hear

6   about.

7            THE WITNESS:  Yes, okay.  The substances that I

8   would consider to be the comparable substances to ethylone

9   would include MDMA, MDEA, methcathinone, and maybe other

10  substances that are cathinones or amphetamines.  Those would

11  be the ones that would be considered comparable that one

12  could make comparisons.

13           The structures of all of these substances are

14  known.  In my opinion, none of them are substantially

15  similar in chemical structure, but the structures are known

16  and they can be compared directly.  The pharmacology for

17  many of the substances as it relates to ethylone is not

18  known.  So --

19           THE COURT:  Right, I understand that, but that's

20  our problem.  I understand that, but that is an issue here.

21           THE WITNESS:  Right.  So, to compare ethylone with

22  MDEA, what you -- what one would do is say, well,

23  ethylone -- based on SAR, ethylone is probably going to be

24  similar to methylone; and based on SAR, MDEA is probably

25  going to be similar to MDMA.  Methylone and MDEA can be

1    compared in terms of their pharmacology data in side-by-side

2    experiments.

3            So, if we have data on methylone and MDMA, if we

4    then say, based on SAR, that ethylone is probably going to

5    be similar to methylone and MDEA is probably going to be

6    similar to MDMA, then one can reach a reasonable educated

7    guess as to what the likely pharmacology comparisons are

8    between ethylone and MDEA.

9            It's really a comparison between methylone and

10   MDMA, but the SAR hypothesis would be that ethylone and

11   methylone will be substantially similar in their effects and

12   that MDMA and MDEA will be substantially similar in their

13   effects, so that the comparison between methylone and MDMA

14   is relevant to the consideration and the comparison between

15   ethylone and MDEA.

16           Otherwise, there's no -- there's no direct way to

17   make the pharmacology tie between ethylone and MDEA and we

18   would be left just with a chemical structure.

19           THE COURT:  You may continue, Mr. Scriven.

20           MR. SCRIVEN:  Thank you.

21   BY MR. SCRIVEN:

22   Q    And just to kind of expound on that, by just looking at

23   the chemical structure, do you think it's possible to

24   determine whether a substance is substantially similar to

25   another?  For example, is it possible by looking at the

```
 1   chemical structure of ethylone and MDEA -- you know, can you
 2   look at those and say, "Hey, look, these are substantially
 3   similar"?
 4   A    One can look at the two structures side by side and
 5   identify structural features that are similar and structural
 6   features that are different.  As far as raising, elevating,
 7   to the standard of substantially similar and such that the
 8   law could treat them equivalently, my opinion is that the
 9   ketone that separates cathinones and amphetamines is
10   important and that cathinones and amphetamines should not be
11   treated as equivalent under the law; and, indeed, they are
12   not treated equivalently under the law.  And applying that
13   logic, my subjective opinion is that ethylone is not
14   substantially similar in chemical structure to MDEA.  But,
15   again, "substantially similar" is not defined anywhere; and
16   so, it's a subjective opinion.
17   Q    Okay.  And so, just to kind of sum up your -- you know,
18   your conclusion, you would then expect the same relationship
19   between ethylone and MDMA to be the same as it is between
20   methylone and MDMA?
21   A    The SAR, the structure activity relationship analysis,
22   would allow one to generate the hypothesis, and it would be
23   a reasonable hypothesis that the comparison between --
24   between methylone and MDMA has predictive value with respect
25   to the comparison between ethylone and MDEA.
```

```
 1   Q     Okay.

 2              MR. SCRIVEN:  Your Honor, if I may just have a

 3   moment.

 4              THE COURT:  You may.

 5              (Pause while Mr. Scriven confers with

 6   Mr. Anderson.)

 7   BY MR. SCRIVEN:

 8   Q    Dr. Dudley, you are aware that the equivalency ratio

 9   for MDEA and MDMA is 500 to 1, 500 grams of marijuana to 1

10   gram of MDMA and MDEA?

11   A     Yes.

12   Q    All right.  Now, in your opinion, what would be the

13   appropriate ratio for ethylone?

14   A     Uh --

15              MS. PELUSO:  Objection to legal conclusion,

16   Your Honor.

17              THE COURT:  What's the legal basis for the

18   objection?

19              MS. PELUSO:  The -- he's not qualified to -- to

20   adopt a ratio -- a potential ratio that's appropriate in

21   this case.

22              THE COURT:  Response?

23              MR. SCRIVEN:  Well, Judge, in just -- maybe I can

24   clarify the question.

25              THE COURT:  Why don't you rephrase the question.
```

```
 1   BY MR. SCRIVEN:
 2   Q    Based on the structural similarities and the effect of
 3   those particular structures on -- on each substance, could
 4   you -- could you make a guess or a --
 5           THE COURT:  Well, don't make a guess.
 6           MR. SCRIVEN:  Not a guess, Your Honor.
 7   BY MR. SCRIVEN:
 8   Q    Could you form a conclusion as to essentially the
 9   relative potency of MDEA versus ethylone?
10           MS. PELUSO:  Again, objection, Your Honor.  The
11   legal conclusion is for the court to make as far as what
12   marijuana ratio applies.  He's not qualified to make that
13   kind of prediction as to what the court should do.
14           THE COURT:  Response?
15           MR. SCRIVEN:  Your Honor -- and, again, I think
16   I'm just -- I'm having a difficult time phasing the
17   question.  What I'm essentially asking Dr. Dudley is, based
18   on the chemical structures, you know, is he able to
19   determine essentially the relative potencies; and then from
20   that, I guess we can certainly argue that if -- that -- what
21   the correct ratio should be.
22           THE COURT:  Okay.  You can ask that question.  I
23   don't know that he can answer it to the extent you're
24   talking about potency, but we'll see.
25   BY MR. SCRIVEN:
```

1  Q     Just based on the chemical structures, are you able to

2  make a determination as to the relative potency between

3  ethylone and MDEA?

4  A     So, ignoring the pharmacology considerations, which

5  is -- and those considerations are in the guidelines, so one

6  shouldn't ignore the pharmacology considerations; but for

7  purposes of this question, looking just at the chemical

8  structure, one can see trends between cathinones and

9  amphetamines, how they're treated, and so, for example, what

10  is the penalty impact for substances that are otherwise --

11  otherwise similar except one's a cathinone and one's an

12  amphetamine.

13       You can also see the penalty impact in the guidelines

14  considering the chemical structure for the introduction of

15  the methylenedioxy ring system.  And so, you can identify

16  these based on all of these trends, all of these pieces, and

17  then fill in the blanks for what one might get for ethylone.

18       It's analogous -- it's loosely analogous to the way

19  chemists were able to anticipate the existence and the

20  properties of elements in the periodic table before those

21  elements were discovered.

22       So, for example, once we had carbon, we anticipated

23  that there was going to be an element silicon, and we could

24  take a guess at its properties based on the surrounding

25  elements.  That would be the analysis that I would apply

1    here.  Start from methamphetamine, which is a 20,000 to 1.

2    If you introduce a methylenedioxy ring system, the penalty

3    drops from 20,000 down to 500.  So, the introduction of the

4    methylenedioxy ring system is by those two data points a

5    mitigating factor in terms of the penalty.

6        Alternatively, start from methamphetamine, introduce

7    the ketone, convert it into the cathinone -- methcathinone.

8    That methcathinone, that penalty drops from 20,000 down to,

9    I think, it's 350 or thereabouts.  So, the introduction of

10   that ketone is also a significant mitigating factor in the

11   penalty.

12       Going from, for example, the difference between the

13   methyl group and the ethyl group or no substitution on the

14   nitrogen, MDMA and MDEA are -- those structures are all

15   treated equivalently.

16       So, if you then go to a structure that has the -- the

17   phenethylamine core but further is a -- has the ketone to

18   make it a cathinone and further has that methylenedioxy ring

19   structure, you can then fill in those blanks and come to a

20   value just based on the math logic from the precedent of the

21   tables.

22       And so, if methamphetamine is 20,000 and methcathinone

23   is 350, that's a reduction of about 98 percent.  So, if MDEA

24   is 500, a similar reduction of about 98 percent to account

25   for the switch from the methamphetamine to the

1  cathinone class -- again, this is just based on chemical

2  structure, not considering the pharmacology -- would get you

3  to a number of 10 to 1 -- actually, it's 9.5 to 1, I think,

4  but it's about 10 to 1.

5  Q    Okay, and in a simplified way, I guess you can say that

6  the introduction of that ketone makes it less dangerous,

7  serious, or mitigates it somehow?

8  A    There are direct comparisons.  The guidelines treat the

9  amphetamines more severely than the cathinones.  There are

10  also more amphetamines listed in the guidelines and a number

11  of known cathinones on the market that are not listed in

12  Schedule I or Schedule II but that are prescription

13  medicines.

14         MR. SCRIVEN:  Thank you.  I have no further

15  questions.

16         THE COURT:  All right, thank you.

17         Mr. Lopez?

18         MR. LOPEZ:  No questions, Your Honor.

19         THE COURT:  All right, thank you.

20         Cross-examination?

21         MS. PELUSO:  Judge, can we request a brief recess,

22  if I can get that out correctly?  I apologize.  I need to

23  consult with some of my agents and experts.

24         THE COURT:  All right.  We'll be in recess for ten

25  minutes.

1           MS. PELUSO:  Thank you.

2           THE COURT:  And, Dr. Dudley, you may step down

3    during that break.

4           (Recess from 12:38 p.m. until 12:52 p.m.)

5           THE COURT:  All right, Miss Peluso, you may

6    inquire.

7                   *CROSS-EXAMINATION*

8    BY MS. PELUSO:

9    Q    Dr. Dudley, I was -- I just wanted to clarify this

10   particular exhibit.  I think it's page 6 of the defendant's

11   exhibit.

12       The -- you say that you derived that from certain

13   studies and, in particular, the Eschelman study?

14   A    Yes.  Not derived it; I transcribed the data straight

15   from the Eschelman study.

16   Q    Straight from the Eschelman study.

17           May I ask a question?

18           THE COURT:  Yes.

19           (Pause while Ms. Peluso confers with her expert.)

20           MS. PELUSO:  I apologize, Your Honor.  I have the

21   wrong slide up here.  I'm just going to clarify one thing.

22   BY MS. PELUSO:

23   Q    Well, let's look at this exhibit, page 8.  Do you see

24   that in front of you?

25   A    Yes.

```
 1    Q    And you took that data directly from a similar study

 2    that you referenced down --

 3    A    This data is from the similar study.  The data on the

 4    left is the data as presented.  The data on the right is a

 5    representation of the reciprocal values normalized to the

 6    least potent of the three substances to make it easier for

 7    the non-specialists to make direct comparisons.

 8    Q    Okay, and was it your testimony that the reason you

 9    don't have MDEA represented on that chart is because the

10    similar study did not include any analysis of MDEA?

11    A    I did not -- if I'm mistaken about that, I was not

12    aware of any -- I did not find any studies that had ethylone

13    and MDEA directly compared side by side.

14    Q    Okay.  If you saw a copy of the similar study, would

15    that refresh your recollection?

16    A    I have the similar study.  I can take a look at it.

17    Q    You have it?

18    A    I do have it, yeah.

19    Q    Do you have that in front of you?

20    A    Yes, I do.

21    Q    If you would turn to what looks like the third page,

22    Table 2, in that study.  Do you have that?

23    A    The third page, Table 1?

24    Q    Table 2.

25    A    Okay, Table 2.  Yes.
```

```
 1   Q    And would you agree that -- does that refresh your
 2   recollection of whether MDEA was also tested side by side
 3   with ethylone in that study?
 4   A    Yes.  My apologies.  MDEA is in the study, yes (nodding
 5   head).
 6   Q    Okay.  You can put that away now.
 7   A    Okay.
 8   Q    Would you -- at the end of your testimony, you made all
 9   kinds of comparisons and -- to the way the guidelines lay
10   out marijuana ratios toward different substances.  Do you
11   remember that?
12   A    Yes.
13   Q    And you pointed out that there was like a 20,000-to-1
14   ratio comparison for methamphetamine?
15   A    For -- yes, for pure methamphetamine.
16   Q    For pure methamphetamine?
17   A    Yes (nodding head).
18   Q    And the non-pure methamphetamine is more like 50 to 1;
19   right; it's substantially less?
20   A    I don't know what the methamphetamine mixtures are
21   penalized according to.  I looked at the actual substance --
22   the methamphetamine substance.  That seemed to be the
23   relevant comparison.
24   Q    Okay.  In your analysis that you made as to all these
25   differences that the Sentencing Guidelines Commission has
```

1  made between all these different substances regarding the

2  ratio factor, your analysis was based -- or comparison was

3  based on chemical structures of all these different

4  substances?

5  A    Yeah.  That's looking just at the chemical structures

6  of the substances and, for example, how the cathinone is

7  treated differently from the amphetamine.

8  Q    And how methamphetamine is treated differently than

9  cocaine and all these other different structures; correct?

10  A    Except that I didn't really focus in on cocaine in

11  terms of chemical structure.  There's -- they're not -- the

12  structure of cocaine -- the chemical structure of cocaine is

13  not really comparable to the amphetamines or the cathinones.

14  Q    Okay.  And, of course, you don't know in your position

15  as a chemist, as a chemical expert, all the different

16  factors that the Sentencing Commission would put into a

17  determination of exactly which marijuana ratio they would

18  apply to a particular substance?

19  A    That is correct.

20  Q    So, your -- your whole analysis was only based on

21  chemical structure?

22  A    Just looking at the chemical structures and the -- yeah

23  (nodding head).

24  Q    And in a similar manner but on a different subject,

25  when you were talking about -- well, let's again focus on, I

```
 1  think it was, back on Exhibit 6 (changing overhead

 2  exhibit) -- or page 6 of the defense exhibit.  Let's just

 3  clarify something on that exhibit.  The top part where you

 4  say "raw pharmacological data from in vitro studies using

 5  human cells to measure effects of potency of various

 6  drugs" -- do you see that part?

 7  A    Yes.

 8  Q    Okay, and this is based on -- and I think that was the

 9  Eschelman study; right?

10  A    Yes.

11  Q    And that study was based on only data they had from

12  in vitro studies?

13  A    These are using human cells as a model, yes.

14  Q    And these human cells are just little human cells that

15  are popped into simply a test tube?

16  A    Yes -- well, they're also -- they've been engineered to

17  express the transporter proteins, yes.

18  Q    Correct.  But, again, it's not in human; it's not in

19  animals?

20  A    It's not in humans; that's correct.

21  Q    And so, would you agree that in order to verify any of

22  those -- that in vitro study, the predictions that would be

23  made from those, that data would be needed from actual

24  in vivo tests?

25  A    In humans, you mean?
```

1  Q     In order to actually come to a conclusion about the

2  relative potencies of these drugs upon a human person, user?

3  A     In terms of coming to a final conclusion about the

4  effects and the potency, you would want to see how the drug

5  performs and quantify how the drug performs in clinical

6  studies in humans.

7      Short of those clinical studies, the -- the data from

8  human cells or from animal models gives you preliminary

9  indications about effects and potency, but it's not

10 conclusive with regard to ultimate human effects.

11 Q     And is that because if there are in vivo tests done,

12 there would be certain control groups?  In other words, if

13 you had the tests done in humans, you would control -- they

14 would have to have like similar genetics, similar metabolism

15 rates?

16 A     So, pharmaceutical companies run clinical trials

17 regularly before bringing a drug to market, and those

18 clinical trials go through progressively larger groups of

19 humans, and there will be ultimately large groups of humans

20 on which the drug will be tested.  There will be control

21 groups where the human subject is given a placebo, a blank

22 drug, and another group where the human subjects are given

23 the actual drug substance, and the effects and the potency

24 are compared.

25 Q     And they can't really be compared unless -- with regard

1   to the human subjects unless those human subjects are all

2   very similar themselves?  In other words, the drug would

3   have had to have been administrated the same way; correct?

4   They would have probably had them administered at the same

5   time of the day, and they would have probably had to have

6   the same type of foods they ate; right?  Because all those

7   things factor into a real result -- a real result or effect

8   on a human central nervous system?

9   A    Certainly you would want to control for as many

10  different variables as possible, and a control group

11  receiving the placebo, the non-drug, is a very important

12  part of that; and yes, drug effects can be dependent on

13  whether or not you take the drug on an empty stomach or a

14  full stomach.

15       So, a well-conducted clinical trial should control for

16  all of those things.

17  Q    Okay.  So, really that is why in this particular case

18  this court can't make any conclusions or draw any real

19  conclusions based on any real potency comparisons for

20  ethylone and MDEA?

21  A    So, there is data available that has predictive value

22  in terms of the pharmacological effects and potency, but

23  there is no data that would allow for a firm conclusion on

24  either pharmacological effects or potency because it hasn't

25  been tested side by side with ethylone in human studies.

1   Q     But there have been SAR studies?

2   A     So, the structure activity relationship allows one to

3   generate a hypothesis, an educated guess, of the likely

4   effect and potency; but, as you say, it's not conclusive.

5   Q     And these -- there have been those SAR tests done on

6   ethylone, as well as MDEA?

7   A     Structure activity relationship isn't an actual test.

8   It's an assessment of data from related substances that will

9   allow you to, again, make an educated guess or hypothesis

10  about a new substance.  You wouldn't -- there wouldn't be

11  SAR data that you would apply to a substance.

12  Q     And that would relate to, as in this case, as

13  Dr. Prioleau testified to, that ethylone certainly will have

14  a predictive effect as a stimulant on the human body just as

15  MDEA would have a predictive effect as a stimulant?

16  A     One can look at the data for similar substances, for

17  other comparable substances, and make an educated guess, a

18  prediction, about an effect and a potency.  So, one could

19  look at the data for other cathinones and amphetamines, for

20  example, and say, "Well, ethylone looks to me to my eye as a

21  chemist and/or pharmacologist to be similar to methylone."

22  So, if methylone has a stimulant effect, then I would

23  predict then that -- hypothetically, I myself, as a chemist

24  and/or pharmacologist, would say that ethylone would also be

25  likely to have that effect and potency.

```
 1        So, the data that you would use is from other
 2   molecules.  It allows you to make an educated guess about
 3   effects and potency of a new substance; but, again, as you
 4   say, it's not conclusive.
 5   Q    It's not conclusive.  But what we can go back to and
 6   make a pretty conclusive comparison to is chemical
 7   structure?
 8   A    The chemical structures are a matter of fact, yes.
 9   Q    Okay.  And in this case, you know that we cannot
10   compare ethylone to methylone for the purposes of the
11   sentencing guidelines because ethylone's not named in the
12   guidelines and methylone's not named in the guidelines;
13   correct?
14   A    I understand, yes -- yes, I understand that neither
15   ethylone nor methylone are named in the guidelines.
16   Q    But MDMA and MDEA are?
17   A    As is methcathinone and other substances.
18   Q    So, if you were to follow your theory of extrapolating
19   comparisons, this court would either come up -- would more
20   closely come up with a comparison of ethylone to MDMA?  Is
21   that what your opinion is?
22   A    No.
23   Q    But you want her to compare methylone with ethylone in
24   order to then derive the ratio to MDMA and not MDEA?
25   A    So, if you're asking me just about the chemical
```

1    structures -- only looking at the chemical structure of

2    ethylone, comparing it against the chemical structures of

3    all the different substances that are listed in the

4    guidelines specifically, the first structure that I would

5    look to is methcathinone, because that is the cathinone that

6    is most closely related to ethylone in the guidelines; but,

7    again, the guidelines call for a chemical structure and

8    pharmacology; and when you look more broadly, considering

9    both the structure and the pharmacology --

10   Q    I understand what you're trying to say, Dr. Dudley,

11   but, in fact, when we're talking about chemical structure,

12   when you're comparing only chemical structure to -- from

13   ethylone to other named substances, then you would have to

14   conclude -- now, I know you don't want to say "substantially

15   similar."  That's a legal term you said was in there -- but

16   you would have to say very similar -- that ethylone would be

17   very similar to MDEA, in fact, a little more similar than

18   any other substances, including MDMA?

19   A    So, without raising -- without reaching the high

20   standard of "substantially similar," which I think the

21   guidelines call for one to identify the most closely related

22   structure, you can consider whether a structure is

23   substantially similar or not, you know, in the follow-up

24   points, but ultimately you sort of rank/order all the

25   structures and see which one is the most similar.

```
 1        If it's just in terms of chemical structures, the

 2   cathinones are generally discussed in the same papers,

 3   categorized in the same way.  When people -- there was an

 4   article just recently in Science Magazine talking about the

 5   effects of the various cathinones and how they relate to

 6   other substances.

 7        And so, that the first place that I would look just in

 8   terms of chemical structures for ethylone is methcathinone.

 9   Q    But have you not opinion -- made an opinion in previous

10   papers that ethylone is most similar in chemical structure

11   to MDEA?

12   A    No.

13             MS. PELUSO:  May I discuss this real quickly?

14             THE COURT:  Yes.

15             (Pause while Ms. Peluso confers with her expert

16   witnesses.)

17   BY MS. PELUSO:

18   Q    In your prior opinion papers, at least one of them, you

19   have, though, made the conclusion that based on not only

20   chemical structures but also pharmacological structure or

21   effects, that ethylone is most similar?

22             MR. ANGELIS:  Judge, I would object.  The

23   government's already indicated they don't want him to give

24   an opinion as to the pharmacological effects, and now she's

25   asking him to -- or she's comparing his prior testimony as
```

1   to his pharmacological effects in this question.

2          THE COURT:  Okay, response?

3          MS. PELUSO:  Your Honor, it's just -- he is

4   extrapolating a lot of pharmacological data when he's made

5   his opinion.  Even though he says it based on chemical

6   structure, he's still nonetheless using the term

7   "pharmacological effects" of different substances.  And I

8   just wanted to bring out the fact that he had, in fact,

9   opined that --

10         THE COURT:  All right, the objection's overruled.

11  It's impeachment; and to the extent that you have

12  documentation that contradicts his testimony here, you are

13  allowed to impeach him with that.

14         MS. PELUSO:  Thank you.  That's all I'm trying to

15  do.

16         THE COURT:  Right.

17  BY MS. PELUSO:

18  Q    So, in at least one of your recent opinions regarding

19  sentencing guideline considerations for ethylone, you

20  actually said that the listed substance, that is, ethylone,

21  is probably most closely related -- I'm sorry.  I had

22  this -- okay, let me restate it.  The listed substance that

23  is probably most closely related to ethylone is MDEA?

24  A    Yes.

25  Q    Did you not say that?

1   A    Yes.  So, in previous cases where I have consulted --

2   in certain cases I've been asked to consider just the

3   chemical structure, just the chemistry.  In other cases, I

4   was asked to consider the chemistry and the pharmacology.

5   In cases where I've been asked to look only at the chemical

6   structures, the conclusion that I came to is the most

7   comparable substance in terms of chemical structure is

8   methcathinone.

9         When considering also the pharmacological effects in

10  potency data, such that it is available, the conclusion I

11  reached when considering again chemistry and pharmacology,

12  the listed substance that is probably the most closely

13  related to ethylone is MDEA.  I have that "probably"

14  qualifier in there because ultimately the pharmacology data

15  regarding the effects and potency are not rigorously

16  conclusive, but the data that's available do have predictive

17  value with respect to ethylone.

18        So, yes, once you consider the pharmacology as well,

19  then MDEA becomes a more appropriate comparison.

20             MS. PELUSO:  Thank you.

21             THE COURT:  Is there any redirect?

22             MR. ANDERSON:  Just briefly, Judge.

23                  *REDIRECT EXAMINATION*

24  BY MR. ANDERSON:

25  Q    So, Dr. Dudley, we know that ethylone is classified as

1  cathinone?

2  A     Yes.

3  Q     And MDEA is an amphetamine?

4  A     Yes.

5  Q     And based upon the opinion that you're giving, the

6  methcathinone drug would probably be the one that's most

7  similar to ethylone as far as structurally; it's probably

8  more similar than MDEA?

9  A     Just in terms of chemical structure.  The first

10  substance that I would look at in the guidelines is the

11  cathinone, which is methcathinone.

12  Q     And we don't know the potency of the drug ethylone as

13  far as its effect on humans because there really haven't

14  been that substantial studies [sic], have there?

15  A     We don't know the effects and the potency of ethylone

16  in humans.  There's data that has predictive value so one

17  can make an educated guess or prediction, but ultimately

18  that is correct, the data is inconclusive.

19  Q     So, I could stand here and predict that now since the

20  Bucs have James Winston they're going to win the Super Bowl

21  next year; right?

22         THE COURT:  You can't do that as an officer of the

23  court.

24         MR. ANDERSON:  Sorry, Judge.

25  BY MR. ANDERSON:

```
 1   Q    But basically that's what we've heard today:  It's just
 2   been predictions and nothing to really substantiate anything
 3   else?
 4   A    The -- there's pharmacology data that -- that underlies
 5   those predictions, but they are predictions, and there is
 6   a -- these hypotheses can often be -- can sometimes be
 7   widely incorrect.  Many times they have predictive value,
 8   the previous data, but oftentimes these hypotheses can be,
 9   yeah, quite incorrect.
10   Q    Doctor, one last question:  Would you, in your opinion,
11   believe that ethylone has the same potency level of
12   methcathinone, or would it be similar, more, or less?  Could
13   you give an opinion to that?
14   A    I could not.  I could, given some time to read the
15   literature, but I did not look with respect to the potency
16   and the effects.  I didn't study ethylone versus
17   methcathinone.  Once I was looking at the pharmacology, I
18   was focused on MDMA as a surrogate for MDEA.
19   Q    And Miss Peluso made reference to a study.  I guess
20   it's in the Eschelman, where there is a study of ethylone to
21   MDEA?
22   A    In the similar study, yes.  I had overlooked that, and
23   I do apologize for that.  The MDEA was included in that
24   similar study.  I was looking at the similar study narrowly
25   for -- because there was a lot of comparison between
```

1   ethylone and methylone.

2   Q    Based upon that study, is ethylone reasonably as potent

3   a drug as MDEA, or would the chart show that MDEA is much

4   more potent, if you'd look at your chart to refresh your

5   recollection, please?

6   A    So, MDEA was not on my chart.  I'm looking to the -- to

7   the original paper.

8       So, in terms of -- and these are studies in human

9   cells.  They -- the data is not there for all different --

10  all the six different metrics; but for the three that are

11  here, ethylone and MDEA were both evaluated in terms of

12  their ability to block the transporters and inhibit the

13  reuptake of the various nerve transmitters.

14      MDEA has an IC50 for the norepinephrine transporter of

15  1.02.  Ethylone has an IC50 of 2.54 for that same

16  transmitter, the lower number being more potent.  So,

17  ethylone would be about two and a half times less potent,

18  or, rather, MDEA would two and a half times more potent in

19  terms just of its ability to block the reuptake of

20  norepinephrine.

21      In terms of the ability to block the reuptake of

22  dopamine, ethylone has an IC50 of 5.68, an inhibitory

23  concentration of 50 percent effectiveness of 5.68.  MDEA is

24  9.3.  So, in this particular metric, ethylone is a little

25  less than twice the potency.  So, 9.3 versus 5.7.

 1          In terms of serotonin reuptake inhibition, MDEA has an

 2   IC50 of 1.27.  Ethylone has an IC50 of 4.46.  So, in this

 3   case, MDEA is about three times the potency for that

 4   particular aspect of the effects.

 5          There are also data reported in this paper with respect

 6   to the ability of ethylone and MDEA to enter the cell and

 7   stimulate the release of two of the neurotransmitters,

 8   dopamine and serotonin.  I don't see data for norepinephrine

 9   in this table at this moment; but in those data, neither

10   ethylone nor MDEA showed any efficacy in terms of

11   stimulating the release of dopamine.  In contrast, MDMA did

12   show that -- show that effect.  So, MDEA and ethylone,

13   neither one registered on the sensor in this particular

14   case.

15          And in terms of the ability to release -- to enter the

16   cell and stimulate the release or serotonin, MDEA had an

17   EC50 of 2.88, whereas ethylone was 9.90.  So that's, I

18   guess, a little more than three, maybe three and a half

19   times.  So, MDEA would be about three and a half times more

20   potent than ethylone in that particular metric.

21          So, it's -- it's not a complete profile of effects, but

22   there are data here that give some indications of the

23   profile of effects and potency that one might anticipate or

24   predict for the end human users, drawing from these human

25   cells and then also considering other studies that show

```
 1   correlation between in vivo and in vitro results.
 2   Q    So, if one were to make kind of like a rounding-off,
 3   based upon that study, they would be able to show that MDEA
 4   and its potency is about twice the potency of ethylone?
 5   A    You know, there's a number of different data points,
 6   and how one would weigh the individual data points would be
 7   a -- an individual's subjective -- at their subjective
 8   discretion.  If you weigh them equally -- you know, I was
 9   reading off the data.  MDEA's two and a half times more
10   potent, three times more potent, three and a half times more
11   potent.  Ethylone was a little less than twice as potent in
12   another metric, and then they don't register in one.  You
13   know, it seems -- I wouldn't argue if someone wanted to
14   conclude that MDEA was twice as potent as ethylone.
15        I don't know that you would be able to pin that number
16   down, but there is a collection of data here that one can
17   use.
18            MR. ANDERSON:  Your Honor, I have no further
19   questions of Dr. Dudley.
20            THE COURT:  Do any other defense counsel wish to
21   ask any questions or Dr. Dudley in redirect examination?
22            MR. ANGELIS:  No, Your Honor.
23            MR. LOPEZ:  No, Your Honor.
24            MR. SCRIVEN:  No, Your Honor.
25            THE COURT:  All right.  Thank you, Dr. Dudley.
```

```
 1   You may return to your seat, sir, or you're free to go.

 2            All right, are there any witnesses?  Is there any

 3   rebuttal testimony from the government?

 4            MS. PELUSO:  No, ma'am -- no, Your Honor.  Thank

 5   you.

 6            THE COURT:  Okay.

 7            All right, would you all like to make closing

 8   statements with regard to this issue?

 9            MS. PELUSO:  Definitely.

10            THE COURT:  Okay.

11                      CLOSING ARGUMENTS

12            MS. PELUSO:  Your Honor, I think that, despite the

13   resistance on the part of Dr. Dudley to say the term

14   "substantially similar" as the guideline directs the court

15   to, he certainly had to agree that based on his data that --

16   and, in fact, he stated in his prior opinion paper that

17   ethylone was most closely related to MDEA for the purposes

18   of the guideline in Subsection Note -- Subsection (A) to

19   Note 6 of the guidelines.

20            So, there's certainly an agreement that they're

21   most closely related substances.  Our two -- our chemist

22   certainly said it was substantially related, and I think

23   based on his analysis and his testimony, the court can

24   certainly conclude that under Application Note 6, Subpart

25   (A), that ethylone, which is not referenced in the
```

1   guideline, is substantially similar to MDEA, which is listed

2   in the guideline.

3           With regard to the other two factors, our

4   pharmacologist had testified that, based on some of the SAR

5   data and based on the in vitro data available, it certainly

6   indicated also that ethylone was substantially similar in

7   its effects -- or its potential effects on certain aspects

8   of the central nervous system in that it's a stimulant and

9   so is MDEA.

10          However, there is -- and I think everybody agrees

11  there really is no data other than the in vitro or SAR data

12  that can actually lead the court to conclude as to

13  Subsection (C) any -- make any conclusion as to whether or

14  not a greater or lesser amount of ethylone would be used to

15  get the same or substantially similar effect on the central

16  nervous system of MDEA.

17          So, back to our previous argument, we believe the

18  court should use Application Note 6 and the factors in (A),

19  (B), and (C) only to the extent practicable; and to the

20  extent practicable, really Subsection (A) is the most -- is

21  the most applicable here and, therefore, the court should go

22  ahead and conclude for the purposes of the guidelines that

23  ethylone should be treated as MDEA, and the appropriate

24  ratio in the guidelines is 500 to 1.

25          THE COURT:  What about the argument, though, that

 1    the -- that MDEA is more potent than ethynol?

 2          MS. PELUSO:  Well, Judge, I don't think there is

 3    any empirical data that the court should rely on in that

 4    regard.  There just simply isn't anything in human studies

 5    or even in animal studies that would indicate, in fact, that

 6    MDEA is more potent than ethylone.  So, therefore, we don't

 7    believe that's a relevant factor.

 8          THE COURT:  Well, the Simmler study addresses it,

 9    at least recreationally, and indicates that 1.25 mg of MDEA

10    equals 175 mg recreationally.

11          MS. PELUSO:  Then, again, Your Honor, those

12    studies are all based on in vitro studies that just are

13    guess work.  Even their own expert said it would be complete

14    guess work.

15          THE COURT:  That's what your experts said with

16    regard to those studies.  I mean, that's basically what they

17    relied upon, because there's nothing else, so they have

18    relied upon those studies because there are no in vivo

19    studies.

20          MS. PELUSO:  Correct, but our pharmacologist said

21    that, therefore, you can't make that conclusion, because

22    they don't have that any in vivo studies to verify the

23    predictable -- what they say that could be predicted as

24    opposed to the actual effect.

25          THE COURT:  Well, her testimony was that it was

```
 1   expected to be.
 2             MS. PELUSO:  Expected.
 3             THE COURT:  Right.
 4             MS. PELUSO:  She said that she would have to have
 5   in vivo tests in order to verify that, and they simply did
 6   not have it.
 7             THE COURT:  Does anybody have any objection with
 8   the court reviewing in total the Simmler study?  It's
 9   available on the Internet.
10             MR. FUTERMAN:  No objection, Judge.
11             MR. ANDERSON:  No objection, Your Honor.
12             MR. ANGELIS:  No objection, Your Honor.
13             MS. PELUSO:  No objection, Your Honor, except to
14   the extent that based on our argument that it can't be
15   completely relied on by the court as predicting the effects
16   of a human cental nervous system.
17             THE COURT:  And the study is what it is.  I mean,
18   I'm obviously not going to be able to go in and change it,
19   but it does have some information that talks about the
20   comparison of ethylone and MDEA from a recreational
21   standpoint, at least.  I understand that there are no in
22   vivo studies with regard to MDEA and ethylone.
23             MS. PELUSO:  Exactly, Your Honor.  So, when we get
24   back to our argument that the court should first use the
25   guidelines to determine which chemical substance is most
```

1  substantially similar, our argument is that it should be

2  MDEA under almost everybody's opinion as the most closely

3  related chemical structure to ethynol -- ethylone.

4         After that, there's nothing in the guidelines that

5  tell the court then to conduct some kind of alteration of

6  the ratio that would apply once you determine that MDEA is

7  the most similar.

8         So, we would argue against any such changing of

9  the ratio based on all this empirical data.

10         THE COURT:  No, I understand, but it has been done

11  in the Middle District, so -- I know you're aware of that.

12         MS. PELUSO:  I'm absolutely aware, Your Honor.  I

13  think in my sentencing memo we point that out.

14         THE COURT:  Right.

15         MS. PELUSO:  But it's the government's position

16  that the courts -- and I -- in the cases where that was

17  done, the courts incorrectly did that.  Our argument is more

18  that the only way the court could possibly consider those

19  kind of potential effects on potency effects is if you were

20  to make any kind of determination under the variance under

21  the different 3553 factors as opposed to in its -- making

22  its decision as to the applicable guideline range.

23         THE COURT:  Give me one second.

24         You may continue.

25         MS. PELUSO:  The -- would you like me to continue?

```
 1            THE COURT:  Yes, you may continue.
 2            MS. PELUSO:  Okay, we would argue also that in
 3   determining -- in using the potency as to determining the
 4   base offense level in these cases, it is really not
 5   appropriate just as, as I argued before, you have a kilogram
 6   of cocaine and the potency or the -- the relative potency of
 7   that cocaine, strength of the cocaine, I guess, is what I'm
 8   trying to say, whether it was 98 pure or 25 percent pure,
 9   would make absolutely no different as to the fact that it's
10   a kilogram of cocaine, and that would be used in determining
11   what the appropriate guideline level was.
12            So, our position is the court should use
13   Application Note 6, determine that the most closely related
14   or substantially related substance is MDMA -- MDEA and then
15   use the 1-to-500 ratio in determining the applicable
16   guideline range or base offense level for each of the
17   defendants in this case.
18            THE COURT:  Okay.
19            MS. PELUSO:  Unless the court has any other
20   questions, that's our -- I think you understand our
21   position.
22            THE COURT:  I do.  Thank you.
23            All right, on behalf of the defendants?
24            MR. ANDERSON:  Thank you, Judge Honeywell.
25            Judge Honeywell, finally I would contend that
```

1    based upon the evidence and testimony that's been heard

2    today from the government's experts and from the expert

3    presented by the defense, that there is more than

4    substantially sufficient ground here for this honorable

5    court to vary from the 500-to-1 ratio.  It seems like the

6    government's witnesses seem to -- I guess the term would be

7    like "have their cake and eat it, too."

8            Dr. Willenbring sits here and admits that there is

9    the difference of an atom called "beta ketone" which makes

10   methylone a cathinone, and still MDEA an amphetamine [sic],

11   but wants to sit here before this honorable court and say

12   that it's not that significant.

13           Dr. Prioleau basically said that, based upon her

14   studies or the structural activity relationship analysis

15   that she has, there is an expected stimulant effect on the

16   human body of ethylone but then testified later on, as she

17   did, I believe, last week, that there is no scientific data

18   to draw conclusions of the potency of ethylone in a human

19   user.

20           Basically, Judge, it's kind of like they want you

21   to sit here and make this leap to what they determine should

22   be applicable in the guideline range, even though there's a

23   difference here into what the classifications are as drugs.

24   One's a cathinone; one's amphetamine.

25           And then the government has the argument here that

1    you shouldn't make a determination of the potency trying to

2    bring in cocaine, but we do make the difference of potency

3    in methamphetamine, which is a drug, and basically there's

4    three different levels of it.  If it's 80 or more pure, it's

5    ice.  If it's 50 percent or more pure, it's actual

6    methamphetamine.  And if it's less than 50 percent, then

7    it's a mixture of methamphetamine.

8         So, Judge, I think, taking the totality of the

9    circumstances here and the evidence presented, this

10   honorable court, as in the well-opinioned decision, I

11   believe, that was done in the case before Her Honor,

12   Judge Scriven, you take a -- and I believe Judge Scriven's

13   exact language or terms was that she considered the factors

14   of "A", (B), (C) to 2D1.1 in Note 6 and noted that they're

15   applicable to the most closely related substance, but that

16   once that determination is made, they really don't play any

17   further factor.

18        And then looking at what I believe was close --

19   she even reduced the level to 400 to 1 in the MDEA and then

20   held that methylone is half that; and the testimony here

21   from Dr. Dudley, based upon the study that was shown

22   concerning ethylone and MDEA, based upon if you're going to

23   do kind of like an analysis or an averaging of things, was

24   that ethylone is about half as potent as MDEA.

25        Now, this drug -- we probably don't have a lot on

1   it because it's only been a little bit more than a year that

2   it's been classified now as an illegal substance.  You know,

3   eighteen months ago, this wasn't really an illegal

4   substance, but now it is, so basically there's not as much

5   testing or knowledge or information on it as cocaine or as

6   methamphetamine or as marijuana, traditional drugs which

7   have been outlawed for a long period of time.

8          But, Judge, based on what's here before you now, I

9   would contend on behalf of all these five gentlemen that you

10  can and should in this substance depart from what the

11  guidelines here call for, 500 to 1, and at least, based upon

12  what's projected in that study that Dr. Dudley just

13  testified to, that it's about as half as potent if you're

14  going to sit here and say that MDEA should be what we're

15  outlining here.  If you stick to that, then basically it

16  shows it's probably about half as potent and then maybe 250

17  to 1, but it's also taking the fact that it's determined to

18  be a cathinone; and, as he stated probably in his opinion,

19  the most closely related is methamphetamine -- methcath --

20  what was -- methcathinone.  I'm sorry, Judge.  It's

21  methcathinone, which is 380 to 1, which if you took half of

22  that, then it would be 190.

23         So, Judge, I would say there's more than

24  substantially enough evidence here, substantially enough

25  basis here, for you to depart from the guidelines of 500 to

1    1 in the table that's currently being requested by the

2    government.

3             Again, relying on what's previously been done in

4    this courthouse in view -- I would contend you have the

5    basis.  The guidelines are no longer mandatory.  You have

6    the option of departing, and basically I don't believe

7    there's anything that the government can hold you to that

8    says that you could not depart from it based upon what's

9    been presented here before you today from even their experts

10   and our expert.  And on behalf of Mr. Cruz and the four

11   other gentlemen here, I would ask this honorable court to at

12   least depart to 250 to 1 in this instance -- at least 250 to

13   1 and basically hold that's the table equivalency that

14   should be used, at least 250 to 1, if not even lower.

15            THE COURT:  But is it appropriate to depart in

16   terms of calculating the guidelines, or should that be a

17   factor that the court considers when applying 3553(a) in

18   voicing my disapproval or disagreement with that ratio

19   that's established with your equivalency table?

20            MR. ANDERSON:  I think you can use both,

21   Your Honor.  I think you can use the 3553 factors and the

22   fact that *Kimbrough* allows you to depart from the

23   guidelines.

24            THE COURT:  But *Kimbrough* isn't talking about the

25   drug equivalency table, though.

```
1              MR. ANDERSON:  Kimbrough is talking about the fact
2    that you may depart from any outlined or previously --
3    predetermined -- based upon, you know, the guidelines now,
4    which are again, not mandatory; and I would contend here the
5    500 to 1 is not mandatory.
6              THE COURT:  Okay, all righty.  Thank you.
7              Any other counsel wish to be heard?
8              MR. ANGELIS:  No, Your Honor.
9              MR. FUTERMAN:  No, Your Honor.  I think
10   Mr. Anderson summed it up rather eloquently.
11             THE COURT:  All righty.  I am going --
12             MR. LOPEZ:  I'm sorry, Your Honor.
13             THE COURT:  I'm sorry, Mr. Lopez.
14             MR. LOPEZ:  Excuse me.  If it please the court.
15             Your Honor, I would be remiss if I didn't at least
16   make one point, because I'm assuming what the court is -- my
17   client's sentencing, Mr. Lika, is scheduled for 4:00 this
18   afternoon.  I don't know if the court is going to come back
19   with a decision before then or continue it or not, but my
20   anticipation is that the court is going to find a ratio and
21   set a level -- a base offense level, whether it be the
22   government's position or whether it be our position or
23   whatever.
24             I did object, for the record, to the 500 to 1
25   ratio, so -- but, actually, in calculating what would
```

```
 1   actually affect Mr. Lika's guideline, it -- anything 200 to
 2   1 or above actually -- at least my calculations -- would not
 3   affect him going any lower.  So, why would I sit here with
 4   him for four hours and go through all of this?  Well,
 5   because I didn't know what was going to happen; and
 6   certainly today I think that Mr. Anderson did just argue
 7   that it could be lower than 250 to 1.  It could -- so, what
 8   I'm just requesting that the court understand as far as my
 9   client is we did hear some testimony of extrapolation as far
10   MDEA, which is 20,000; that if you took -- if you said it
11   was 98 percent less potent, ethylone was -- I think he even
12   got down to 10 to 1 -- that, of course, the court could find
13   it lower.
14          And so, I'm just making that argument for my
15   client that if it's anything less than 200 to 1, if the
16   court determines that, that would affect his guideline.
17          Thank you.
18          THE COURT:  All right.  The court is going to be
19   in recess.  With regard to those of you who are not
20   scheduled for sentencing today, you are free to go, and I
21   will issue -- advise you of my decision or you will hear
22   about it from the other defendants who are here.
23          My expectation right now is I'm going to have
24   lunch and then hopefully have an opportunity look at the
25   Simmler study; and when I come back for the sentencing
```

1   that's scheduled at 2:30, which is now not going to be 2:30,

2   I will announce my ruling with regard to this issue, and

3   that would be the sentencing for Mr. Chauca.

4           MR. FUTERMAN:  Yes, Your Honor.

5           THE COURT:  So, we'll be back at 2:45.  We're in

6   recess.

7           And the others of you are free to go, unless

8   you're scheduled for sentencing today, and then you would

9   need to be back at the appropriate time, realizing that

10  we're running about 15 minutes behind.  And then there's

11  some others scheduled for sentencing later on next month, et

12  cetera, and you don't need to return at all.  I will

13  announce my ruling and may even follow up with a written

14  ruling just to memorize what I announce.

15          If there's nothing further, we are in recess.

16          COURT SECURITY OFFICER:  All rise.

17          (Recess at 1:42 p.m.)

18                          - - - - -

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3

4           I, SHERRILL L. JACKSON, Federal Official Court

5     Reporter for the United States District Court, Middle

6     District of Florida, Tampa Division,

7           DO HEREBY CERTIFY, that I was authorized to and

8     did, through use of Computer-Aided Transcription, report in

9     shorthand the proceedings and evidence in this cause, as

10    stated in the caption on page 1 of this transcript, and that

11    the pages numbered 1 to 146, inclusive, constitute a true

12    and correct transcription of my shorthand report of said

13    proceedings and evidence.

14           IN WITNESS WHEREOF I have hereunto set my hand

15    this 28th day of February, 2016.

16

                           *s/Sherrill L. Jackson*
17           _____

                      SHERRILL L. JACKSON, RPR, FPR
18                    Federal Official Court Reporter

19

20

21

22

23

24

25

*SHERRILL L. JACKSON, RPR, FPR*
*Federal Official Court Reporter, U.S. District Court*
*Middle District of Florida, Tampa Division*